IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DOUGLAS FOSTER, | HONORABLE JEROME B. SIMANDLE |
| Plaintiff, | |
| v. | Civil Action No. 16-5117 (JBS/KMW) |
| TOWNSHIP OF PENNSAUKEN, et al., | **OPINION** |
| Defendants. | |

APPEARANCES:

Mark Robert Natale, Esq.
Leo B. Dubler, III, Esq.
LAW OFFICES OF LEO B. DUBLER, III, LLC
20000 Horizon Way
Suite 300
Mount Laurel, NJ 08054
    Attorneys for Plaintiff

Corey S.D. Norcross, Esq.
Francis X. Manning, Esq.
STRADLEY RONON STEVENS & YOUNG LLP
2005 Market Street
Suite 2600
Philadelphia, PA 19103
    Attorneys for Defendants


**SIMANDLE, Judge:**

**I.  INTRODUCTION**

    Plaintiff Douglas Foster (hereinafter, "Plaintiff") brings

this suit against Defendants John Coffey, Michael Probasco,

Scott Gehring, Thomas Connor, and the Township of Pennsauken

(hereinafter, "Defendants") for their alleged retaliatory

actions following Plaintiff's exercise of First Amendment rights of free speech and association. Plaintiff, a former police officer with the Pennsauken Police Department, alleges that his termination in May 2015 was motivated by a campaign of retaliation by the Defendants, his supervisors and employer, in response to his advocacy for changes in the length of officer shifts and his association with his police union.

This matter comes before the Court upon the Defendants' motion to dismiss Plaintiff's Complaint under Rule 12(b)(6), Fed. R. Civ. P. For the following reasons, the motion to dismiss will be granted without prejudice.

## II.  FACTUAL AND PROCEDURAL HISTORY[1]

Plaintiff was hired by the Pennsauken Police Department in 2003. (Compl. at ¶ 11.) Plaintiff was an active member of the Fraternal Order of Police (hereinafter, "FOP"), a labor union representing police officers in Pennsauken. (Id. at ¶ 14.) On March 22, 2013, Plaintiff, along with six other active members of the FOP, filed a lawsuit before Judge Renee Bumb alleging that Defendants Coffey, Probasco, the Township of Pennsauken, along with the Township Administrator Ed Growchowski, had

---

[1] For purposes of the pending motions, the Court accepts as true the version of events set forth in Plaintiff's Complaint, documents explicitly relied upon in the Complaint, and matters of public record.  See Schmidt v. Skolas, 770 F.3d 241, 249 (3d Cir. 2014).

retaliated against them for their exercise of First Amendment rights. Killion v. Coffey ("Killion I"), No. 13-1808, 2015 WL 7345749, at *1-2 (D.N.J. Nov. 19, 2015).[2] The Killion I plaintiffs alleged that these and other actions by the defendants were motivated by a desire to retaliate against the plaintiffs for their advocacy in favor of a proposal to implement twelve-hour shifts for police officers. Id. at *2. The plaintiffs claimed that this violated 42 U.S.C. § 1983 (Count I) and the New Jersey Civil Rights Act (Count II). Id.

On November 19, 2015, Judge Bumb dismissed the complaint in Killion I without prejudice, for failure to adequately plead that the plaintiffs' advocacy for twelve-hour shifts was constitutionally protected or that the defendants' conduct toward plaintiffs was motivated by retaliation. Id. at *1. Judge Bumb gave the plaintiffs twenty-one days to amend their complaint. Id. at *11. Five of the seven plaintiffs refiled an amended complaint, but Plaintiff Foster was not among them.[3] (Pl.

---

[2] The Killion I complaint included all the facts outlined supra that predate the initial filing of that complaint in March of 2013. Id. at *1-2, *10.

[3] The amended complaint of the plaintiffs who chose to refile Killion I was dismissed with prejudice for failure to state a claim. Killion v. Coffey, No. 13-1808, 2016 WL 5417193, at *13 (D.N.J. Sep. 27, 2016). Judge Bumb's dismissal of the complaint was recently affirmed by the Third Circuit in a non-precedential opinion. Killion v Coffey, -- F. App'x --, 2017 WL 2628881 (3d Cir. June 19, 2017). The parties have submitted supplemental briefing regarding the impact of the Third Circuit's Killion affirmance, which will be addressed in Part IV, below.

Opp'n at 2.) Instead, after the deadline to amend the <u>Killion I</u> complaint had lapsed, Plaintiff filed a separate action in this Court – the present Complaint – on August 22, 2016. (<u>Id.</u>) Plaintiff's Complaint alleges that Defendants' decision to charge, suspend, and terminate Plaintiff following their 2014 investigation into his inaccurate activity log – an incident which occurred after <u>Killion I</u> was filed in 2013 – was the culmination of Defendants' campaign to retaliate against him for speaking out in favor of twelve-hour shifts and associating with the FOP. (Compl. at ¶ 173.) Plaintiff claims that the Defendants, through their alleged retaliation, deprived him of his First Amendment rights of free speech and association, in violation of 42 U.S.C. § 1983. (<u>Id.</u> at ¶¶ 174-75.)

Beginning around 2009, the Pennsauken Police Department had begun to consider implementing twelve-hour shifts for police officers. (<u>Id.</u> at ¶ 15.) While Defendants Coffey, Probasco, Gehring, and Connor – supervisors at Pennsauken Police Department – were opposed to twelve-hour shifts and "regularly spoke out against" the prospective change, Plaintiff, along with several other officers, "actively campaigned and advocated" in favor of twelve-hour shifts. (<u>Id.</u> at ¶¶ 18-21.)

Plaintiff alleges he advocated, both as an active member of the FOP and "through his own private speech," that implementation of twelve-hour shifts would improve officer and

public safety. (Id. at ¶¶ 23, 33.) The prior setup of officer shifts often left only five officers on the overnight shift to cover Pennsauken's six districts, leaving an entire district without an officer on patrol on "countless" nights. (Id. at ¶¶ 34-36.) Plaintiff claimed that this shortage presented a safety issue to both officers and the public, one which could be remedied by switching to twelve-hour shifts. (Id. at ¶ 37.) Additionally, Pennsauken's means of addressing these coverage issues was to hold an officer over from the prior shift and pay that officer overtime. (Id. at ¶¶ 41-42.) At the time the switch to twelve-hour shifts was being considered, Pennsauken was paying a "substantial" amount of overtime, and the Plaintiff argued that twelve-hour shifts would mean the department would no longer need to hold anyone onto the overnight shift, which would "drastically reduce" overtime and save the municipality money. (Id. at ¶¶ 40, 43-44.)

Plaintiff "regularly" spoke out and advocated in favor of twelve-hour shifts and criticized the supervisors at the Police Department for their refusal to embrace the change. (Id. at ¶¶ 27-29.) In addition, Plaintiff took on responsibilities as a leader in the FOP, representing his shift at union meetings focused on developing the new contract, which would include twelve-hour shifts. (Id. at ¶¶ 31-32.)

In 2011, in spite of several contentious meetings during which Defendant Coffey and other supervisors protested the change, the Department implemented twelve-hour shifts. (Id. at ¶¶ 52-53.) Defendants Coffey and Probasco continued to vocally oppose the switch to twelve-hour shifts after the change had occurred. (Id. at ¶ 57.) Defendant Coffey – with whom Plaintiff had a "positive" relationship prior to the debate over twelve-hour shifts – began to completely ignore Plaintiff as their relationship turned "hostile." (Id. at ¶¶ 97-99.)

Plaintiff had never received discipline as an officer prior to his campaign for twelve-hour shifts. (Id. at ¶ 60.) His clean disciplinary record began to change in May of 2011, when Plaintiff was given a roadwork assignment. (Id. at ¶¶ 62, 64.) The roadwork was completed thirty minutes before his shift was scheduled to end; Plaintiff, according to "common custom and practice" for Pennsauken police offers on roadwork shifts, left his shift once the roadwork was complete. (Id. at ¶¶ 65-67.) Plaintiff received a written reprimand from Defendant Connor for leaving the assignment early. (Id. at ¶ 69.) Defendant Probasco called Plaintiff a "thief and a criminal" following the incident. (Id. at ¶ 70.) Additionally, Defendant Probasco compared Plaintiff to other "babies" in the department – in reference to the officers who advocated for twelve-hour shifts –

and stated that Plaintiff was going to be his "project." (Id. at ¶¶ 74-75.)

That same month, Plaintiff responded to a report of a fight at Pinsetters Bar in Pennsauken between two off-duty Pennsauken police officers and two patrons (hereinafter, the "Pinsetters Incident"). (Id. at ¶¶ 101-02.) Plaintiff responded to the scene and followed standard operating procedure in investigating the incident. (Id. at ¶ 103.) Following the incident, Defendant Coffey filed twenty-five disciplinary charges against eight officers who had advocated in favor of twelve-hour shifts, including the Plaintiff, who was charged with "neglect of duty" and received a 30-day suspension despite not being involved in the incident in any way. (Id. at ¶¶ 105-06, 108-09.)

Defendant Probasco began to monitor the GPS on Plaintiff's police vehicle. (Id. at ¶ 76.) In June of 2011, Plaintiff responded to an ambulance call at a residence. (Id. at ¶ 78.) Afterwards, Defendant Probasco ordered Plaintiff to produce a written report to justify his response time to the incident. (Id. at ¶¶ 78, 80.) Plaintiff wrote the report explaining his response time; Defendant Probasco did not charge Plaintiff with any discipline, but did assign Plaintiff to desk duty, a "common form of punishment" in the department. (Id. at ¶¶ 81-82.)

Then, on June 14 and 15 of 2011, Plaintiff attended a training class in Pennsylvania with two other officers. (Id. at

¶¶ 84-85.) Plaintiff was required to use two holidays to attend
the training, but the other two officers – who were not among
those who had advocated for twelve hour shifts – were not
required to use holidays. (Id. at ¶¶ 86-87.)

On or around July 26, 2011, Plaintiff was accused of
leaving the sally port door open; though another officer stepped
forward and admitted that he was the one to leave the door open,
Defendant Probasco issued Plaintiff a written reprimand and
again assigned Plaintiff to desk duty. (Id. at ¶¶ 90-93.)

Plaintiff, along with six other officers, filed Killion I
in March of 2013. Killion I, 2015 WL 7345749, at *2. The
complaint alleged, inter alia, that Plaintiff's receipt of
"major" discipline for the Pinsetters Incident, his compulsory
use of holidays to attend training sessions, and the "silent
treatment" he received from Defendant Coffey were part of a
campaign of retaliation for the plaintiffs' advocacy in favor of
twelve-hour shifts. Id. at *1-2, *10.

On the night of June 4, 2014, while Killion I was pending,
Plaintiff was assigned the overnight (7:00 P.M. – 7:00 A.M.)
shift. (Compl. at ¶ 112.) When leaving headquarters after having
a dinner break and relieving the Information Officer, Plaintiff
took a mental note of the time on the large clock outside of
headquarters to document in his activity log. (Id. at ¶¶ 113-
17.) He continued his shift in his vehicle, and used the

vehicle's car clock and the clock on the laptop in his vehicle to continue documenting his time in the activity log. (Id. at ¶ 120.) Both of those clocks show different times relative to the large clock outside of headquarters, it is "common" for Pennsauken police officers' activity logs to have inaccuracies, as there is no policy, procedure or custom that dictates how Pennsauken's officers prepare their activity logs or specifies which clocks they must use. (Id. at ¶¶ 124-26.)

Later that month, Defendant Coffey reviewed the activity logs and had some concerns with Plaintiff's log, mainly that Plaintiff had spent a longer time than usual in headquarters. (Id. at ¶ 130.) At Defendant Coffey's request, Plaintiff prepared a memo explaining that he was in headquarters for a long time because he was covering for the Information Officer. (Id. at ¶¶ 132-33.) Defendant Coffey asked the Internal Affairs Officer to investigate Plaintiff's situation; the officer found that while Plaintiff had documented that he was patrolling Highland Park starting at 1:50 A.M., he had actually not left headquarters until 2:17 A.M. (Id. at ¶¶ 135, 137-38.)

Plaintiff was questioned on July 2, 2014 by Defendant Gehring, who did not ask Plaintiff what clocks he used to complete the activity log or whether there was an explanation for the discrepancy. (Id. at ¶¶ 141-42.) Defendant Gehring prepared a report for Defendant Connor, recommending charges

against Plaintiff. (Id. at ¶ 145.) Defendant Connor decided to pursue charges against Plaintiff, and Plaintiff was served with a Preliminary Notice of Disciplinary Action including a number of charges relating to Plaintiff's inaccurate logbook (hereinafter, "the logbook incident") on August 22, 2014. (Id. at ¶¶ 149-50.) As a result of these charges, Plaintiff was suspended, and Defendant Pennsauken sought his termination. (Id. at ¶ 158.) Two officers who were on duty the morning of June 5, 2014 were at headquarters for as long as Plaintiff and also had discrepancies in their logbook; they received a written reprimand and a one-day suspension. (Id. at ¶¶ 153-57.)

Plaintiff requested a meeting with Pennsauken's Township Administrator in hopes of resolving the charges; he complained that the Defendants were part of a "furious campaign to destroy" him. (Id. at ¶¶ 163, 165.) The Township Administrator responded that there was nothing they could to do help him, and that he would have to wait for the process to play out. (Id. at ¶ 166.) One to two weeks after Plaintiff's meeting with the Township Administrator, Defendant Coffey recommended that Plaintiff receive an additional disciplinary charge for being a "repeat offender"; Plaintiff received notice of this additional charge in November of 2014. (Id. at ¶ 167.)

On May 22, 2015, the Police Department's appointing authority upheld these charges, removing Plaintiff from his

position with the department. (<u>Id.</u> at ¶ 170.) The removal was affirmed by the Civil Service Commission on December 18, 2015; the Civil Service Commission's decision is currently up for reconsideration. (<u>Id.</u> at ¶¶ 171-72.)

In his Complaint, Plaintiff seeks relief for his charges (Count III), suspension (Count II), and termination (Count I) from the logbook incident, which he alleges was motivated by retaliation for his exercise of the First Amendment rights of speech and association, in violation of 42 U.S.C. § 1983. (Pl. Opp'n at 3-4.) He also seeks relief for the disproportionate charges filed against him as compared to other officers who did not advocate for twelve-hour shifts (Count IV) and the "unjustified" decision to seek termination rather than other forms of discipline (Count V). (<u>Id.</u> at 4.)

**III. STANDARD OF REVIEW**

Pursuant to Rule 8(a)(2), Fed. R. Civ. P., a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Specific facts are not required, and "the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" <u>Erickson v. Pardus</u>, 551 U.S. 89, 93 (2007) (citations omitted). While a complaint is not required to contain detailed factual allegations, the plaintiff must provide the "grounds" of his "entitle[ment] to relief", which requires more than mere

labels and conclusions. <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007).

A motion to dismiss under Rule 12(b)(6), Fed. R. Civ. P., may be granted only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court concludes that the plaintiff failed to set forth fair notice of what the claim is and the grounds upon which it rests. <u>Id.</u> A complaint will survive a motion to dismiss if it contains sufficient factual matter to "state a claim to relief that is plausible on its face." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 663 (2009). Although a court must accept as true all factual allegations in a complaint, that tenet is "inapplicable to legal conclusions," and "[a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." <u>Id.</u> at 678.

## IV. DISCUSSION

### A. Res Judicata

First, Defendants argue that Plaintiff's Complaint should be dismissed on res judicata grounds, because <u>Killion I</u> was a final judgment, and Plaintiff did not timely amend his complaint in <u>Killion I</u> following Judge Bumb's dismissal of the case without prejudice. (Def. Br. at 7.) Res judicata – also known as claim preclusion – prohibits a party from reopening and relitigating issues that were or could have been decided in a

previous case involving the same parties and arising out of the
same cause of action. Sutton v. Sutton, 71 F. Supp. 2d 383, 389
(D.N.J. 1999). Under federal law, res judicata requires the
defendant to demonstrate (1) that there was a final judgment on
the merits in a prior suit involving (2) the same parties or
parties in privity, and (3) that the present case is based on
the same cause of action. Lubrizol Corp. v. Exxon Corp., 929
F.2d 960, 963 (3d Cir. 1991) (citation omitted). The Court will
begin its analysis by focusing on the third prong of the res
judicata analysis to determine whether Plaintiff's Complaint and
Killion I are based on the same cause of action.

Defendants argue that Plaintiff's Complaint is based on the
same cause of action as Killion I, because both complaints plead
the same allegations under the same theory of recovery, and –
apart from Plaintiff's charges, suspension and termination
following his inaccurate logbook in June of 2014 – include the
same facts and events. (Def. Br. at 11-12.) Defendants claim
that Plaintiff's inclusion of the logbook incident, which did
not occur until fifteen months after the filing of Killion I,
amounts only to "the addition of new facts to support the [same]
general legal theories" and therefore does not suffice to
distinguish the successive causes of action. (Def. Br. at 12.)
Plaintiff contends that Killion I and the present Complaint are
not based on the same cause of action because they are

predicated on "separate adverse actions" with different proofs
and material facts. (Pl. Opp'n at 7.)

The term "cause of action" is difficult to precisely
define; for purposes of res judicata, it is often thought to
turn on the "essential similarity of the underlying events"
giving rise to the complaint. United States v. Athlone Indus.,
Inc., 746 F.2d 977, 983 (3d Cir. 1984) (quoting Davis v. U.S.
Steel Supply, 688 F.2d 166, 171 (3d Cir. 1982)). While res
judicata extends to claims that "could have been brought" as
well as those actually brought forth in the prior action, the
extent of claims that could have been brought includes only
those that could have been filed on the date of the initial
complaint, as events that postdate the initial filing of the
previous action arise from a separate cause of action. Morgan v.
Covington Twp., 648 F.3d 172, 178 (3d Cir. 2011).

### 1. Whether the Complaint Arises from Events That Are Essentially Similar to Those in Killion I

Four factors determine whether the events underlying
successive cases are sufficiently similar to support a finding
that they are based on the same cause of action: (1) whether the
acts complained of and the demand for relief are the same, (2)
whether the theory of recovery is the same, (3) whether the
evidence necessary at trial is the same, and (4) whether the
material facts alleged are the same. Athlone, 746 F.2d at 984.

Noting that the theory of recovery – predicated on
Defendants' alleged retaliation for Plaintiff's exercise of
First Amendment rights, in violation of Section 1983 – is the
same in both cases, the analysis turns on whether the acts
complained of, the necessary evidence, and the material facts
are the same in both cases.

The acts complained of in the present case are largely
those related to the charges and termination stemming from the
2014 logbook incident, which was not at issue in the prior
action as it occurred after the plaintiffs filed their complaint
in Killion I. For the purposes of evaluating successive causes
of action, the relevant acts are those "wrong[s] for which
redress is sought." Id. Here, Plaintiff describes in his
Complaint the events of June 5, 2014 (the date of his logbook
inaccuracies), the investigation by Internal Affairs, the list
of disciplinary charges he received for the inaccuracies, and
his suspension and termination following the investigation.
(Compl. at ¶¶ 119, 135-37, 151, 158, 170-71.) None of these
events were included in the Killion I complaint, as the acts for
which Plaintiff sought redress in Killion I included, inter
alia, Defendants suspending him for his role in the May 2011
brawl at Pinsetters Bar, and forcing him to use holidays to
attend a training session in June of 2011. Killion I, 2015 WL
7345749, at *2, *10. While those earlier events are pled within

Plaintiff's present Complaint, Plaintiff has included them only
to demonstrate the "context and history" of the alleged
retaliation, "not to establish liability;" the specific acts for
which Plaintiff seeks redress are those pertaining to the
logbook incident. (Compl. at ¶¶ 84-87, 101-09; Pl. Opp'n at 3-
4.)

Because the relevant acts underlying the two cases are
different, it follows that both the evidence and material facts
required to establish liability in this case (here, the
evidentiary support necessary to prove that the acts comprising
logbook incident constituted retaliation) are not the same as
those required to establish liability in Killion I, where the
necessary support for Plaintiff included sufficient facts and
evidence to establish that the discipline for the Pinsetters'
Incident and compulsory use of holidays for training sessions
amounted to retaliation. Killion I, 2015 WL 7345749, at *2, *10.
Accordingly, the events underlying the two claims are not
sufficiently similar to support a finding that the claims arise
from the same cause of action.

**2. Whether the Complaint Could Have Been Brought in Killion
I**

Defendants argue that the logbook incident – though not
part of the pleadings in Killion I – falls within the ambit of
claims that could have been brought under the same cause of

action for the purposes of res judicata, because the logbook incident occurred before the judgment in <u>Killion I</u> was issued. (Def. Reply Br. at 5.) The Court does not agree.

The Third Circuit's decision in <u>Morgan v. Covington Twp.</u>, 648 F.3d 172 (3d Cir. 2011) compels this Court to deny the motion for res judicata. There, a plaintiff police officer filed a claim alleging that the defendants retaliated by initiating a criminal investigation against him after he requested a hearing following a disciplinary suspension. After filing the complaint, the plaintiff was terminated as a result of the criminal investigation; the plaintiff tried to amend his complaint to include the facts of his termination, but the district court denied the motion. <u>Morgan</u>, 648 F.3d at 175-76. Plaintiff then filed a separate case alleging that the defendants retaliated against him for his request of a hearing and for his filing of the initial action by terminating him. The jury eventually found for the defendants. <u>Id.</u> The district court then dismissed the subsequent action on res judicata grounds, holding that it arose out of the same cause of action and the same "operative facts" as the initial action. <u>Id.</u> at 176-77.

On appeal, the Third Circuit reversed, holding that res judicata does not bar claims that are predicated on actions that postdate the filing of the initial complaint. <u>Id.</u> at 178. In

doing so, the Third Circuit adopted the reasoning of its sister

Courts of Appeals:

> Five other Courts of Appeals have already adopted a
> bright-line rule that res judicata does not apply to
> events post-dating the filing of the initial
> complaint. Smith v. Potter, 513 F.3d 781, 783 (7th
> Cir. 2008) ("Res judicata does not bar a suit based on
> claims that accrue after a previous suit was filed. .
> . . It does not matter whether, as in the case of
> harassment, the unlawful conduct is a practice,
> repetitive by nature . . . that happens to continue
> after the first suit is filed, or whether it is an
> act, causing discrete, calculable harm, that happens
> to be repeated."); Rawe v. Liberty Mut. Fire Ins. Co.,
> 462 F.3d 521, 529 (6th Cir. 2006) ("'Simply put,
> [Rawe] could not have asserted a claim that [she] did
> not have at the time'" the complaint was filed.)
> (citation omitted); Mitchell v. City of Moore, 218
> F.3d 1190, 1202-03 (10th Cir. 2000) ("[W]e agree with
> those courts holding the doctrine of claim preclusion
> does not necessarily bar plaintiffs from litigating
> claims based on conduct that occurred after the
> initial complaint was filed."); Computer Assocs.
> Int'l, Inc. v. Altai, Inc., 126 F.3d 365, 369-70 (2d
> Cir. 1997) ("For the purposes of res judicata, '[t]he
> scope of the litigation is framed by the complaint at
> the time it is filed.'") (citation omitted); Manning
> v. City of Auburn, 953 F.2d 1355, 1360 (11th Cir.
> 1992) ("[W]e do not believe that the res judicata
> preclusion of claims that 'could have been brought' in
> earlier litigation includes claims which arise after
> the original pleading is filed in the earlier
> litigation."); see also Los Angeles Branch NAACP v.
> Los Angeles Unified Sch. Dist., 750 F.2d 731, 739 (9th
> Cir. 1984) (noting that res judicata would encompass
> acts "occurring prior to the commencement" of the
> prior litigation).

> We see no reason to part with our sister Circuit
> Courts.

Id. at 177-78.

Here, following the Third Circuit's instructions in Morgan, it would be inappropriate to bar Plaintiff's claim regarding the logbook incident – which postdates the commencement of Killion I by over a year – on grounds of res judicata.

Additionally, Defendants rely on Elkadrawy v. Vanguard Grp., Inc., 584 F.3d 169, 174 (3d Cir. 2009), for the notion that res judicata dismissal should be granted in the present case in spite of the new acts in the complaint related to the logbook incident.  In Elkadrawy, the court dismissed the complaint on claim preclusion grounds – despite the pleadings containing some discriminatory acts not alleged in the preceding complaint – because the allegations could have been brought as part of the first complaint. Elkadrawy, 584 F.3d at 173-74. However, the critical distinction between Elkadrawy and the present case is that the newly-pled acts in Elkadrawy occurred more than five months prior to the filing of the initial complaint in the prior action, whereas here, the acts related to the logbook incident did not occur until fifteen months after the Killion I complaint was filed. Id. at 174.

Because the scope of claims that could have been brought for res judicata purposes includes only those that could have been brought at the time of the initial filing of the complaint – and naturally, Plaintiff could not have brought claims about an incident that had not yet occurred – the operative acts

19

alleged in the present Complaint are not subject to claim preclusion. The Court thus denies Defendants' motion to dismiss Plaintiff's Complaint on res judicata grounds.[4]

**B. Collateral Estoppel**

Next, Defendants move to dismiss Plaintiff's Complaint on grounds of collateral estoppel. Collateral estoppel, or issue preclusion, prevents a party from successive litigation of a factual or legal issue that was previously litigated and resolved as an essential part of the prior court's determination, even if the issue reappears as part of a different claim. Taylor v. Sturgell, 553 U.S. 880, 892 (2008). The doctrine of collateral estoppel is intended to avoid repetitive litigation, permit parties to rely on prior judgments, and allow an adversary a sense of repose following the resolution of an issue by the courts. Hailey v. City of Camden, 650 F. Supp. 2d 349, 354 (D.N.J. 2009) (quoting 18

---

[4] Regarding the two remaining elements of res judicata, the Court finds that Judge Bumb's grant of 12(b)(6) dismissal without prejudice in Killion I amounted to a final decision on the merits with respect to Plaintiff once the deadline to amend lapsed. See, e.g., Hoffman v. Nordic Naturals, Inc., 837 F.3d 272, 279 (3d Cir. 2016) (holding that a district court's 12(b)(6) dismissal without prejudice constituted a decision on the merits, which became a final judgment once the time to amend had expired). Because the Court finds that Plaintiff's Complaint is not barred by res judicata because Plaintiff's Complaint and Killion I are not based on the same cause of action, it need not reach the question of whether the additional parties to the present Complaint are in privity with those who were parties to Killion I.

Charles Alan Wright, Arthur R. Miller & Edward H. Cooper,
Federal Practice and Procedure § 4416 (2d ed. 2002)).

The prerequisites for the application of collateral
estoppel are satisfied when: (1) the issue sought to be
precluded is the same as that involved in the prior action; (2)
that issue was actually litigated; (3) the issue was determined
by a final and valid judgment; and (4) the determination was
essential to the prior judgment. Hailey, 650 F. Supp. 2d at 354
(quoting Peloro v. United States, 488 F.3d 163, 174-75 (3d Cir.
2007)). The Court will focus on the first and fourth prongs of
the collateral estoppel analysis to determine whether the issues
in Plaintiff's Complaint differ materially from those
adjudicated in Killion I, and whether the issues on which the
defendant seeks estoppel were essential to the judgment in
Killion I.

**1. Whether the Issues are the Same as in Killion I**

Defendants contend that the difference between the issues
in Plaintiff's Complaint and those in Killion I are legally
insignificant and thus do not prevent application of collateral
estoppel. (Def. Br. at 14.) While Plaintiff concedes that the
theory of liability is the same in his Complaint and Killion I,
he contends that collateral estoppel is inapplicable because the
factual and legal issues in his Complaint differ from Killion I.
(Pl. Opp'n at 9-10.) Plaintiff argues that the "gravamen" of his

Complaint is the 2014 logbook incident, which was not (and could not have been) pled in Killion I, and so he should not be estopped from litigating the facts and issues related to that incident. (Id. at 9.)

The party moving to collaterally estop an issue bears the burden of establishing the similarity of the issue or issues in the successive claims. See Chisholm v. Defense Logistics Agency, 656 F.2d 42, 50 (3d Cir. 1981). Issues are sufficiently similar to permit collateral estoppel when "the same general legal rules govern both cases and the facts of both cases are indistinguishable as measured by those rules." Hailey, 650 F. Supp. 2d at 354 (quoting Suppan v. Dadonna, 203 F.3d 228, 233 (3d Cir. 2000)).

Materially-distinguishable facts between successive cases can themselves be sufficient to defeat collateral estoppel by showing that the issues in those cases are not the same. In Suppan v. Dadonna, 203 F.3d 228, 231 (3d Cir. 2000) (hereinafter, "Suppan II"), police officers brought First Amendment retaliation claims, alleging that supervisors deliberately lowered the plaintiffs' scores on tests used to rank officers for upcoming promotions, in retaliation for the plaintiffs' exercise of their First Amendment rights. A prior case, Suppan v. City of Allentown, No. 97–2102, 1997 WL 476359 (E.D. Pa. Aug. 20, 1997) (hereinafter,

"Suppan I") – which included the same defendants as Suppan II, and centered on whether a change in the seniority policy constituted retaliation against an adversely-affected plaintiff – had already been adjudicated in favor of the defendants. The court in Suppan II nevertheless denied the defendants' assertion of collateral estoppel because the defendants failed to establish that the issues in the two cases were the same. The challenged conduct in Suppan I was "not the same retaliatory conduct at issue" in Suppan II, and the latter case involved potential harms including "mental anxiety, stress [and] loss of reputation" that were not present in the former case; the court thus held that because the threshold for an actionable claim under Section 1983 was a question of fact, the factual differences between the cases were not legally indistinguishable. Suppan II, 203 F.3d at 233.

Here, as in Suppan II, the retaliatory conduct at issue in Plaintiff's Complaint is broader than in Killion I. Additionally, the anxiety, embarrassment, and "tremendous amount of stress" that Plaintiff claims he suffered as a result of the loss of his job following the logbook incident is separate from the harm inflicted by the alleged retaliatory actions – a short term suspension and compulsory use of vacation days for training – in Killion I. (Compl. at ¶¶ 180-81.) Thus, the Court cannot say that the factual differences between the present Complaint

and that of <u>Killion I</u> are legally indistinguishable for the purposes of collateral estoppel.

**2. Whether the Issues were Necessarily Decided in <u>Killion I</u>**

Even if the issues underlying the respective cases in this instance were identical, their determination was not essential to the judgment in <u>Killion I</u>. If issues are determined but the judgment is not dependent upon the determinations, relitigation of those issues in a subsequent action between the parties is not precluded. RESTATEMENT (SECOND) OF JUDGMENTS § 27 cmt. h (AM. LAW. INST. 1982). The primary focus of the analysis is whether a particular issue was critical to the judgment or merely dicta. <u>O'Leary v. Liberty Mut. Ins. Co.</u>, 923 F.2d 1062, 1067 (3d Cir. 1991). Collateral estoppel extends only to issues essential to the judgment because non-essential issues may not be as carefully considered in the prior action, and losing parties might be dissuaded from appealing a non-essential issue that was incorrectly resolved if they are likely to lose on appeal due to other issues on which the prior judgment rested. RESTATEMENT (SECOND) OF JUDGMENTS § 27 cmt. i (AM. LAW. INST. 1982).

Here, the issues that Defendants argue should be collaterally estopped – whether Plaintiff's conduct was constitutionally protected, whether his facts adequately plead retaliation, and whether there is a causal link between Plaintiff's conduct and the retaliation – were not issues on

which the judgment in <u>Killion I</u> depended. (Def. Br. at 13-14.)

<u>Killion I</u> was dismissed for failure to state a claim, on grounds
that the plaintiffs failed to adequately identify the
constitutional conduct in which they engaged, and failed to
plead a causal link between their protected activity and the
alleged retaliation (because the court was unable to assess
temporal proximity between conduct and the alleged retaliation
without more specifics as to the plaintiffs' conduct). <u>Killion
I</u>, 2015 WL 7345749, at *11. Essentially, the case was dismissed
without prejudice for a failure to meet standards of pleading
specificity. The court's dismissal when Foster was a plaintiff
did not depend on a finding that the plaintiffs' conduct as
alleged was <u>not</u> constitutionally-protected, nor a finding that
the defendants' acts failed to amount to retaliation, nor a
finding that there was no causal link between the conduct and
retaliation.[5] It would be inappropriate to preclude Plaintiff

---

[5] Similarly, the Third Circuit's decision read the remaining five
plaintiffs' amended complaint as deficient in getting past the
"initial hurdle of showing the 'private citizen' aspect for
purposes of their § 1983 claims," <u>Killion v. Coffey</u>, -- F. App'x
--, 2017 WL 2628881, at *2 (3d Cir. June 19, 2017). The
pleading was seen as deficient because it contained only
essentially a "cursory statement," made with "scant elaboration
that their 'speech was made in their capacities as citizens for
First Amendment purposes'" arguing "that they had an 'obligation
[] as citizen[s] . . . to speak out on behalf of public and of
FOP 3.'(Appellant's Br. 16-17 (second alteration in original).)"
<u>Id.</u> at *2. Thus, as discussed <u>infra</u>, it remains unclear whether
Foster may plead sufficient factual grounds for the "private
citizen" aspect of his claims of protected speech and

25

from the opportunity to litigate any of these issues in the present case. As a result, the Court denies Defendants' motion to dismiss Plaintiff's Complaint on collateral estoppel grounds.

## C. First Amendment Retaliation Claim

Next, Defendants argue that Plaintiff has failed to adequately plead a retaliation claim that would entitle him to relief. To state a First Amendment retaliation claim under Section 1983, Plaintiff must allege that (1) he engaged in a protected activity, (2) the retaliatory action was sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) there was a causal link between the plaintiff's conduct and the defendant's retaliation. Thomas v. Independence Twp., 463 F.3d 285, 296 (3d Cir. 2006); Lauren W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007); Killion v. Coffey, -- F. App'x --, 2017 WL 2628881, at *1 (3d Cir. June 19, 2017)(non-precedential).

### 1. Whether Plaintiff Alleges Constitutionally-Protected Conduct with Sufficient Specificity

Defendants claim that Plaintiff has failed to allege the specific facts required to show that his conduct in advocating for twelve-hour shifts was protected private speech of a public employee under the First Amendment. (Def. Br. at 18.) Plaintiff

---

associational activity, and his patrolmen-colleagues' failure to meet that pleading standard does not preclude him from having an opportunity to do so if his facts are different.

asserts that the details of his advocacy are sufficiently pled to establish that it constituted protected speech. (Pl. Opp'n at 11.) When speaking on conditions of their employment, public employees – including police officers – are entitled to First Amendment protections only when speaking about public affairs under particular circumstances. Garcetti v. Ceballos, 547 U.S. 410, 417 (2006). A public employee's speech is protected by the First Amendment when (1) in making it, the employee spoke as a private citizen, (2) the statement involved a matter of public concern, and (3) the government employer lacked adequate justification for differential treatment of the employee relative to any other member of the general public. Hill v. Borough of Kutztown, 455 F.3d 225, 241-42 (3d Cir. 2006) (citing Garcetti, 547 U.S. at 417); Killion v. Coffey, -- F. App'x --, 2017 WL 2628881 (3d Cir. June 19, 2017); Knight v. Drye, 375 F. App'x 280, 282 (3d Cir. 2010).

**a. The Complaint Does Not Plead Facts Showing the Plaintiff Spoke as a Private Citizen**

The Supreme Court has held that a public employer may restrict speech that "owes its existence" to the public employee's professional responsibilities without infringing upon that employee's First Amendment rights. Garcetti, 547 U.S. at 421-22. Thus, public employees who make statements "pursuant to their official duties" are not private citizens for the purposes

of a First Amendment retaliation claim. Id. at 421. To determine
whether an employee's speech was made pursuant to his official
duties, courts evaluate whether the speech fell within the
individual's job responsibilities, whether it related to special
knowledge or experience acquired on the job, whether it was made
inside or outside the work place, and whether it concerned the
job's subject matter. Houston v. Twp. of Randolph, 934 F. Supp.
2d 711, 727-28 (D.N.J. 2013). But see Garcetti, 547 U.S. at 420
(2006) (noting that statements made inside the workplace rather
than publicly are not dispositive of whether the employee spoke
as a private citizen); see Lane v. Franks, 134 S. Ct. 2369, 2379
(2014) (clarifying that a public employee's speech concerning
information acquired by virtue of special knowledge or
experience from his employment is only one non-dispositive
factor out of many).

Here, Plaintiff has alleged two general forms of advocacy
for twelve-hour shifts: (1) his speech as a union representative
for the FOP, and (2) his "own private speech." (Compl. at ¶ 33.)
Plaintiff's advocacy for the shifts in his position as a
representative for the union was not done as a private citizen,
because those statements were made pursuant to his duties as a
representative of the union in negotiating their new contract.
See Hill v. City of Phila., 331 F. App'x 138, 142 (3d Cir. 2009)
(affirming the district court's grant of summary judgment to

defendants on grounds that the plaintiff did not show that he
was acting as a private citizen in speaking as a union
representative); see also Beresford v. Wall Twp. Bd. of Educ.,
No. 08-2236, 2010 WL 445684, at *6 (D.N.J. Feb. 3, 2010)
(dismissing plaintiff's retaliation claim because his speech was
made in his capacity as the negotiator of his union). The
statements in Plaintiff's Complaint outlining his alleged
advocacy outside the context of his union representation are too
bare-boned and conclusory to allow this court to draw the
reasonable inference that his conduct was protected. Plaintiff
claims that he advocated for twelve-hour shifts "both to his
coworkers and to other citizens," and that he criticized his
supervisors "as a private citizen criticizing public leaders."
(Compl. at ¶¶ 29, 49-50.) Had the specifics of this conduct been
included in his Complaint, Plaintiff's speech could amount to
speech made as a private citizen. As currently pled, however,
Plaintiff's statements as to his conduct are baldly conclusory,
failing to provide the "form, timing, content and context" of
his advocacy necessary to substantiate his claim. Killion v.
Coffey ("Killion II"), No. 13-1808, 2016 WL 5417193, at *10
(D.N.J. Sep. 27, 2016), aff'd, -- F. App'x --, 2017 WL 2628881
(3d Cir. June 19, 2017). Plaintiff has thus provided
insufficient facts to support his claim that his advocacy for
twelve-hour shifts was done as a private citizen. The Court

therefore grants Defendants' motion to dismiss without
prejudice.  Plaintiff will have one final opportunity to plead
factual grounds for his conclusory allegation that he acted as a
"private citizen."

**b. The Complaint Provides Sufficient Facts to Support the Notion
That Twelve-Hour Shifts May be a Matter of Public Concern**

Although the Court grants Defendants' dismissal motion for
failure to state sufficient facts under the "private citizen"
prong, the Court will also address the remaining elements of
Plaintiff's First Amendment retaliation claim. While public
employees do not relinquish all First Amendment rights by virtue
of their employment, the State does have a legitimate interest
in the efficient provision of government services performed
through those employees. Pickering v. Bd. of Educ., 391 U.S.
563, 568 (1968). Courts thus balance the interest of public
employees in exercising free speech with the interest of the
State in promoting public service by extending First Amendment
protections for public employees only to matters of "public
concern." Id. An employee's speech addresses a matter of public
concern when it can be "fairly considered as relating to any
matter of political, social, or other concern to the community."
Holder v. City of Allentown, 987 F.2d 188, 195 (3d Cir. 1993)
(quoting Connick v. Myers, 461 U.S. 138, 146 (1983)). Issues of
concern to the community include topics that extend beyond the

plaintiff and relate to "officer and public safety", the quality
of a government office's service to the public, or instances of
misconduct by public officials. Beyer v. Borough, 428 F. App'x
149, 154, 159 (3d Cir. 2011); Sanguigni v. Pittsburgh Bd. of
Pub. Educ., 968 F.2d 393, 398 (3d Cir. 1992).

Here, Defendants claim that "shift length" is not a public
concern because it relates only to working conditions and does
not touch on a matter of public interest. (Def. Br. at 23.) The
Court disagrees. Plaintiff argues that his actions touch on
issues of public concern relating to public safety and
government expenditures. (Compl. at ¶¶ 37-40.) Plaintiff notes
that, in advocating for twelve-hour shifts, he frequently cited
the fact that the current system often left only five officers
to patrol the six covered districts on the overnight shifts.
(Compl. at ¶¶ 34-36.) This presented a safety issue for both
officers and the public – one which Plaintiff argued would be
cured by twelve-hour shifts – that, accepted as true, suffices
to raise the issue of twelve-hour shifts to one of public
concern. (Compl. at ¶ 37.) See Beyer, 428 F. App'x. at 159
(finding that a police officer's posts on the internet
criticizing a local council and advocating for AR-15 rifles to
be purchased for the police force amounted to an issue of public
concern because it implicated officer and citizen safety); see
also Shefcik v. Vill. of Calumet Park, 532 F. Supp. 2d 965, 975-

76 (N.D. Ill. 2007) (holding that an officer's letter to his
Chief of Police – concerning issues related to manpower
shortages on various shifts and the safe amount of hours worked
by officers per day – amounted to speech on issues of public
concern because allocation of police officers and officer safety
are matters of concern to the public).

Plaintiff also claims that the current system of addressing
manpower shortages, which involved paying substantial amounts of
overtime to officers to cover overnight shifts, resulted in
expenditures of taxpayer money that could be "drastically
reduce[d]" by moving to twelve-hour shifts. (Compl. at ¶¶ 41-
44.) Again, if true, this amounts to an issue of public concern.
See Czurlanis v. Albanese, 721 F.2d 98, 104 (3d Cir. 1983)
(holding that wastes of taxpayer money concern the function of a
segment of the government and are thus of public importance).

Plaintiff argues that his report to the Township
Administrator regarding the Police Chief's alleged retaliation
was also on a topic of public concern. (Compl. at ¶ 203.)  Here,
the Court disagrees. Police misconduct, including official
malfeasance, abuse of office, and neglect of duties, can amount
to an issue of public concern.  Garcia v. Newtown Twp., 483 F.
App'x 697, 702 (3d Cir. 2012). However, Plaintiff notes that he
arranged the meeting solely to discuss the Chief's "campaign of
retaliation" against him. (Compl. at ¶ 201.) Internal complaints

articulated "solely because of their personal effect on the employee" do not fall under the scope of public concern. <u>Garcia</u>, 483 F. App'x at 702. Nevertheless, the Complaint as a whole alleges sufficient facts pertaining to the public importance of twelve-hour shifts to fulfill this element of the claim.[6]

**c. The Complaint Has a Plausible Basis for Asserting That There May Be No Adequate Justification for Defendants' Differential Treatment of the Plaintiff**

Next, Defendants argue that Plaintiff's Complaint should be dismissed because the Complaint itself includes Defendants' justifications for their discipline of Plaintiff. (Def. Br. at 26-29.) When public employees speak about matters of public concern, employer restrictions on their speech must be "necessary for [the] employers to operate efficiently and

---

[6] The Court recognizes that Judge Bumb in <u>Killion II</u> held that the plaintiffs failed to plead that they were speaking on a matter of public concern, because the plaintiffs support of twelve-hour shifts "related only to their working conditions" and the plaintiffs did not "seek to communicate [the benefits of twelve-hour shifts] to the public." <u>Killion II</u>, 2016 WL 5417193, at *12. However, the fact that a public employee does not communicate an issue to the public is not dispositive of whether that issue is a public concern. <u>See Garcetti</u>, 547 U.S. at 420 ("That Ceballos expressed his views inside his office, rather than publicly, is not dispositive. Employees in some cases may receive First Amendment protections for expressions made at work."). In light of the Third Circuit's inclusion of officer and public safety in <u>Beyer</u> – as well as governmental waste of taxpayer money in <u>Czurlanis</u> – as matters of public concern, this Court finds that Plaintiff has stated facts sufficient to support his claim that twelve-hour shifts for police officers are a matter of public concern.

effectively." Garcetti, 547 U.S. at 419. The inquiry here centers on whether there is a justification for the differential treatment of the plaintiff relative to "any other member of the general public." Hill v. Borough of Kutztown, 455 F.3d 225, 241-42 (3d Cir. 2006).

Here, Defendants argue that their decision to discipline the plaintiff for the logbook incident was justified in light of his falsified activity log from June 5, 2014. (Def. Br. at 29.) If that were the extent of Plaintiff's Complaint, Defendants would be correct, as law enforcement agencies have "wide latitude to regulate an employee's [conduct]." Ober v. Evanko, 80 F. App'x 196, 201 (3d Cir. 2003). However, Plaintiff also alleges that other officers who were present at headquarters on June 5 had inconsistent logbooks and yet were subject to significantly lesser punishments, including a written reprimand and a one-day suspension. (Compl. at ¶¶ 154-57.) It is thus plausible, from the face of Plaintiff's Complaint, that the Defendants' differential treatment of his punishment relative to others in his department was not adequately justified.

**2. Whether Plaintiff Adequately Pled Facts That Could Constitute Retaliatory Conduct**

The second prong of a retaliation claim requires that the alleged retaliatory conduct must have been sufficient to "deter a person of ordinary firmness from exercising his First

Amendment rights." Thomas, 463 F.3d at 296. Even an act as small as withholding a "birthday party for a public employee" can constitute actionable retaliation for exercise of free speech rights. Suppan v. Dadonna, 203 F.3d at 234 (quoting Rutan v. Republican Party, 497 U.S. 62, 76 n. 8 (1990)). Here, the effect of the alleged retaliation far exceeds the absence of a birthday cake, as Plaintiff was terminated from his job. This action, as pled, is therefore sufficient to fulfill the element of the plaintiff's claim regarding retaliatory conduct.

**3. Whether Plaintiff Adequately Pled Facts That Could Plausibly Establish Causation**

Finally, Defendants argue that Plaintiff failed to include sufficient facts in his Complaint to allow a trier of fact to infer a causal link between his advocacy for twelve-hour shifts and his termination. To meet the causational element of a First Amendment retaliation claim, Plaintiff must allege facts sufficient to infer that their protected conduct was a "substantial or motivating factor" behind the defendants' retaliation. Springer v. Henry, 435 F.3d 268, 275 (3d Cir. 2006). The two primary ways of establishing this causal link are to show temporal proximity and/or evidence of a pattern of antagonism. Norman v. Reading Sch. Dist., 441 F. App'x 860, 866 (3d Cir. 2011) (quoting Abramson v. William Paterson Coll., 260 F.3d 265, 288 (3d Cir. 2001)). Temporal proximity by itself must

be "unusually suggestive" of a retaliatory motive in order to infer causality. Thomas v. Town of Hammonton, 351 F.3d 108, 114 (3d Cir. 2003). If temporal proximity is not unusually suggestive, then "timing plus other evidence" can suggest a pattern of antagonism sufficient to establish causation. Id. Such evidence is "not limited to evidence of timing or demonstrative proof" of animus or retaliatory motive, but instead includes evidence "gleaned from the record as a whole" that may support an inference of causation. Watson v. Rozum, 834 F.3d 417, 424 n.16 (3d Cir. 2016) (quoting Farrell v. Planters Lifesavers Co., 206 F.3d 271, 281 (3d Cir. 2000)); see also Schlegel v. Koteski, 307 F. App'x 657, 662 (3d Cir. 2009) ("[The court] may review the broader record to determine if there is sufficient evidence from which a reasonable jury could find that a link exists between the plaintiff's protected conduct and the defendant's adverse action.").

Here, Plaintiff does not plead specific facts to indicate an unusually suggestive proximity between Plaintiff's conduct and Defendants' alleged retaliation. Plaintiff's advocacy culminated in the implementation of twelve-hour shifts in 2011, and the events of the logbook incident did not occur until June 2014. (Compl. at ¶¶ 53, 127.); see, e.g., Dolan v. Penn Millers Ins. Co., 625 F. App'x 91, 94 (3d Cir. 2015) (holding that a proximity of three months between plaintiff's conduct and

defendants' retaliation was not unusually suggestive). However, taking Plaintiff's Complaint as a whole, he plausibly pleads a pattern of antagonism beginning at the time of his 2011 advocacy and continuing to his termination sufficient to fulfill the causational element of this claim.

For instance, Plaintiff alleges that prior to his advocacy for twelve-hour shifts, he had never been disciplined. (Compl. at ¶ 60.) Plaintiff then claims that the retaliatory actions began in May of 2011 with the roadwork incident, followed by his being called one of the "babies" by his supervisor in an alleged reference to his support for twelve-hour shifts, his assignment to desk duty for his response to an ambulance call in June of 2011, his compulsory use of holidays to attend training sessions that same month, his reprimand for leaving the sally port door open in July, his 30-day suspension for the Pinsetters Bar incident in August of 2012, and finally his charges, suspension and termination following the logbook incident in 2014. (Compl. at ¶¶ 62-68, 75, 78-82, 84-87, 90-93, 111, 149, 158, 170-71; Coffey Decl. at ¶¶ 2-3.) By the terms of Plaintiff's Complaint, the discipline he received for each of these incidents, when accepted as true, could suggest a pattern of antagonism: His decision to leave the roadwork assignment upon completion was "common custom and practice"; he responded to the ambulance call "just as he always had for years without ever receiving any

discipline"; he was not responsible for leaving the sally port door open; and he had no involvement in the Pinsetters Bar incident yet was punished. (Compl. at ¶¶ 71, 79, 92, 94, 106.) Thus, despite the absence of temporal proximity between Plaintiff's actions and the alleged retaliation for which he seeks relief, the facts of the chronology of retaliation pled in his Complaint are sufficient for a jury to plausibly infer that the logbook incident was the culmination of Defendants' pattern of antagonism in retaliation for his advocacy for twelve-hour shifts. See Robinson v. Se. Pa. Transp. Auth., 982 F.2d 892, 895 (3d Cir. 1993) (affirming the trial court's ruling awarding plaintiff damages for a Title VII claim despite an absence of temporal proximity, because the defendants repeatedly disciplined the plaintiff over "minor matters" and subjected him to a "constant barrage" of disciplinary action soon after he had complained about his supervisors).[7] The Plaintiff therefore pleads sufficient facts to meet the causation prong of his retaliation claim. Overall, for reasons stated above, the Complaint does not sufficiently plead a cause of action for

---

[7] "In evaluating the merits of [plaintiff's] Title VII . . . claims, the Court may also consider First Amendment retaliation cases under [Section] 1983, as retaliation claims under [both] statutes are subject to essentially the same analysis." Brown v. Pennsylvania, No. 14-201, 2017 WL 762009, at *4 n.5 (M.D. Pa. Jan. 30, 2017) (citing Zappan v. Pennsylvania Bd. of Prob. & Parole, 152 F. App'x 211, 217 (3d Cir. 2005)).

retaliation due to Plaintiff's exercise of free speech as a private citizen, and it will be dismissed without prejudice with permission to file an Amended Complaint attempting to correct these noted deficiencies.

### D. Freedom of Association

Defendants also move to dismiss Plaintiff's claim of retaliation for his exercise of the right to free association with his police union. (See, e.g., Compl. at ¶¶ 24, 25, 30-33, 174, 185, 204, 229, 231, 258-259.) As with claims pertaining to retaliatory violations of free speech rights, a public employee who claims that his employer retaliated against him for exercise of his right to associate must allege that (1) he was engaged in constitutionally-protected conduct, (2) his employer undertook an adverse employment action against him, and (3) there exists a causal link between his protected conduct and the employer's action whereby the protected conduct was a "substantial" or "motivating factor" in the government employer's adverse employment decision. Rode v. Dellarciprete, 845 F.2d 1195, 1204 (3d Cir. 1988) (quoting Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)); Killion v. Coffey, -- F. App'x --, 2017 WL 2628881, at *1 (3d Cir. June 19, 2017).

Because the elements of a freedom of association retaliation claim are the same as the elements of a freedom of speech retaliation claim, the Court refers to its analysis of

the first two elements of Plaintiff's freedom of speech claim in

holding that (1) Plaintiff has failed to allege that he was

engaged in constitutionally-protected conduct, and (2) Plaintiff

adequately pled that his employer undertook an adverse

employment action by terminating him. See Killion II, 2016 WL

5417193, at *5 ("As the claims share the same elements, the

Court will address the freedom of speech and freedom of

association claims together.").[8] The Court will thus focus on the

third element of the claim to determine whether Plaintiff has

---

[8] The Third Circuit extends the requirement that a public
employee's association only amounts to constitutionally-
protected conduct if done as a private citizen. See Cindrich v.
Fisher, 512 F. Supp. 2d 396, 404 (W.D. Pa. 2006) (citing Hill v.
Borough of Kutztown, 455 F.3d at 241-242 (3d Cir. 2006)) ("The
Third Circuit has recently held that an essential element of a
First Amendment Claim, whether it is a freedom of speech claim
or a freedom of association claim, is that the plaintiff must be
acting as a private citizen."). Here, as discussed in the
section pertaining to his freedom of speech claim, Plaintiff has
failed to meet the private-citizen requirement with the
requisite factual specificity.
      The Third Circuit has not yet determined whether freedom of
association claims share with speech claims the requirement that
the association must relate to an issue of public concern.
Killion II, 2016 WL 5417193, at *6. See also Sanguigni, 968 F.2d
393 at 400 (noting that the Sixth and Seventh Circuits have
applied the public-concern requirement to freedom of association
claims, while the Eleventh Circuit has refused to apply the
requirement to association claims). However, as addressed in the
section regarding Plaintiff's speech claim, he has already pled
facts sufficient to establish that twelve-hour shifts may
plausibly relate to a matter of public concern, and so the Court
need not reach the issue of whether to extend this requirement
to the Plaintiff's associational claim.

adequately pled a plausible causal link between his protected
associational conduct and Defendants' adverse employment action.

Defendants argue that there is no causal link between
Plaintiff's association with the FOP and their decision to
charge, suspend and terminate him for his inaccurate logbook.
(Def. Br. at 36-37.) To establish such a causal link, Plaintiff
must plead facts sufficient to infer that his association with
the FOP was a "substantial or motivating factor" behind
Defendants' punishment. Rode, 845 F.2d at 1204. While Plaintiff
pleads facts sufficient to infer that his speech in favor of
twelve-hour shifts was a substantial or motivating factor in the
Defendants' alleged retaliation, he fails to draw the same
causal connection between his union association and the
retaliation.

It is unclear from the allegations of the present Complaint
what Foster did or said as a union member or officer that was
protected activity leading to the adverse employment action that
he claims.  The Complaint, though lengthy, has few factual
statements about his actual associational activity and instead
uses conclusory, generalized language that does not suffice for
this element under the Iqbal pleading test, supra. For example,
the Complaint alleges that Foster "associated with the FOP in
their efforts to switch to twelve hour shifts" (Compl. at ¶ 24),
and that he "was an active member of the FOP, and advocated for

41

the switch in that role as well." (Id. at ¶ 25.)  Foster, at an
unstated point in time, "took on added responsibilities as a
leader in the union" (id. at ¶ 31) and was "chosen by his
coworkers to represent his shift at union meetings focused on
developing the new contract that would include twelve hour
shifts." (Id. at ¶ 32.) His exercise of First Amendment rights
included "freely associating with the FOP, including taking
leadership positions there." (Id. at ¶ 185.) During Defendants'
alleged "illegal campaign of retaliation and harassment," Foster
arranged a meeting with Pennsauken's Township's Township
Administrator, Pennsauken's Public Safety Officer, and the FOP
representative in order to discuss Defendant Coffey's
retaliation (id. at ¶ 201), but it is unclear whether Foster was
acting in his union leader capacity, or whether is merely
claiming, as ¶ 204 states, that his associational activity arose
from the fact that "his union, the FOP, who was present." The
Complaint does, however, claim he was disciplined more severely
than other officers who were "not active in the union and did
not hold leadership roles in the union." (Id. at ¶ 231; see also
¶ 258.)

Several statements in Plaintiff's Complaint draw specific
connections between his advocacy for twelve-hour shifts and his
adverse treatment, but his Complaint fails to plead facts that
could establish the temporal or motivational link between

42

Plaintiff's association with the union and Defendants' retaliation. Plaintiff's Complaint claims that Defendants' retaliation began "immediately following" the implementation of twelve-hour shifts, and that his relationship with Defendant Probasco was "positive" up until the implementation, at which point it turned "hostile." (Id. at ¶¶ 58, 99.) However, Plaintiff does not specify when he joined the FOP – mentioning only that he was hired by the police department in 2003 – and so the Court cannot ascertain whether the Plaintiff's association with the union has any temporal relation with the onset of Defendants' retaliation. (Id. at ¶¶ 11, 14.) If anything, it appears he was associated with the FOP during at least part of the eight years he was employed by the department prior to the implementation of twelve-hour shifts: a timeframe in which the Plaintiff himself pleads that "he had never been disciplined," that he had a "positive" relationship with Defendant Coffey, and that retaliation had not yet begun. (Id. at ¶¶ 58, 60, 99.) As noted above, it is unclear when his union leadership duties began and what they entailed as related to the issues herein.

Additionally, there is no evidence in the Complaint that Defendants' purportedly antagonistic behavior was motivated by his union association, rather than his support for twelve-hour shifts. For example, the Complaint alleges that Defendant Probasco called Plaintiff one of the "babies" because Plaintiff

favored twelve-hour shifts, not because he was a member of the union. (Id. at ¶ 75.) Similarly, Plaintiff claims that following the Pinsetters Incident, Defendants filed disciplinary charges targeted at officers who supported twelve-hour shifts, not at officers who participated in the FOP. (Id. at ¶ 107.)

As currently pled, Plaintiff's Complaint does not include sufficient facts to allow for the reasonable inference that the Defendants' alleged retaliation was substantially motivated by his association with the union. It is conceivable these factual grounds can be supplied in an amended complaint clarifying his union activities and advocacy and how the alleged retaliation was triggered by his associational conduct. For these reasons, the Court will dismiss Plaintiff's freedom of association claim without prejudice.

**E. Qualified Immunity**

Finally, Defendants contend that they are entitled to qualified immunity even if Plaintiff had stated a valid retaliation claim. Qualified immunity protects government officials from standing suit, provided that their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Kelly v. Borough of Carlisle, 622 F.3d 248, 253 (3d Cir. 2010). To defeat qualified immunity, a plaintiff must (1) have actually asserted a

violation of a constitutional right, and (2) the
constitutionality of that right must have been "clearly
established" at the time of the defendants' alleged
infringement. Larsen v. Senate of Com. Of Pa., 154 F.3d 82, 86
(3d Cir. 1988); Rossiter v. City of Philadelphia, No. 16-1187,
2016 WL 7478494, at *3 (3d Cir. Dec. 29, 2016) (quoting Saucier
v. Katz, 533 U.S. 194, 201 (2001)).

For the reasons discussed above, Plaintiff has failed to
fulfill the first prong of these requirements, because he has
not adequately alleged a violation of his constitutional rights.
Because the Court will grant Plaintiff leave to amend his
Complaint, the Court will refrain from addressing the issue of
whether Defendants are entitled to qualified immunity at this
time. See, e.g., King v. Harmotta, No. 15-297, 2016 WL 3661566,
at *5 (W.D. Pa. July 5, 2016).

## V. CONCLUSION

For the foregoing reasons, the Court will dismiss
Plaintiff's claims without prejudice. Plaintiff will be granted
leave to amend his pleadings within 14 days of the entry of this
Opinion, in order to attempt to cure the deficiencies identified
herein.  An appropriate Order shall issue on this date.

**June 27, 2017**                          **s/ Jerome B. Simandle**
Date                                       JEROME B. SIMANDLE
                                           U.S. District Judge