IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| DOUGLAS FOSTER,<br><br>                Plaintiff,<br><br>    v.<br><br>TOWNSHIP OF PENNSAUKEN, et al.,<br><br>                Defendants. | HONORABLE JEROME B. SIMANDLE<br><br><br>Civil Action<br>No. 16-5117 (JBS/KMW)<br><br>**OPINION** |

APPEARANCES:

Mark Robert Natale, Esq.
Leo B. Dubler, III, Esq.
LAW OFFICES OF LEO B. DUBLER, III, LLC
20000 Horizon Way
Suite 300
Mount Laurel, NJ 08054
    Attorneys for Plaintiff

Corey S.D. Norcross, Esq.
Francis X. Manning, Esq.
STRADLEY RONON STEVENS & YOUNG LLP
2005 Market Street
Suite 2600
Philadelphia, PA 19103
    Attorneys for Defendants

**Table of Contents**

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . 2
II.  FACTUAL AND PROCEDURAL HISTORY . . . . . . . . . . . . 3
 A.  Factual Background . . . . . . . . . . . . . . . . . 3
 B.  Procedural Background . . . . . . . . . . . . . . . 14
  1. Case to Date and Instant Motions . . . . . . . . . 14
  2. Collateral Estoppel-Related Effect of Decisions of
    Administrative Law Judge and Appellate Division . . . . 17
III. STANDARD OF REVIEW . . . . . . . . . . . . . . . . . 20
IV.  DISCUSSION . . . . . . . . . . . . . . . . . . . . . 21

  A.  First Amendment Retaliation (Freedom of Speech): Speech or Conduct as a "Private Citizen" . . . . . . . . . . . . . . 22

  B.  First Amendment Retaliation (Freedom of Association) . . 47

  1. Allegations of Associational Conduct . . . . . . . . . 49

  2. Allegations of Causal Link . . . . . . . . . . . . . . 64

  C.  Qualified Immunity . . . . . . . . . . . . . . . . . . 70

  D.  *Monell* Liability . . . . . . . . . . . . . . . . . . 89

V.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . 96

**SIMANDLE, District Judge:**

## I.  INTRODUCTION

Plaintiff Douglas Foster (hereinafter, "Plaintiff") brings this suit against Defendants John Coffey, Michael Probasco, Scott Gehring, Thomas Connor, and the Township of Pennsauken (hereinafter, "Defendants") for their alleged retaliatory actions following Plaintiff's exercise of what he alleges were his First Amendment rights of free speech and association. Plaintiff, a former police officer with the Pennsauken Police Department, alleges that his termination in May 2015 was motivated by a campaign of retaliation by the Defendants, his supervisors and employer, in response to his advocacy for changes in the length of officer shifts and his association with his police union.

The Court previously granted Defendants' motion to dismiss without prejudice under Rule 12(b)(6), Fed. R. Civ. P. [Docket Items 27 & 28.] Plaintiff subsequently filed an Amended Complaint [Docket Item 29], and Defendants filed another Motion

to Dismiss pursuant to Rule 12(b)(6) [Docket Item 32], which is presently before the Court.

The principal issues to be decided include: whether the Amended Complaint contains adequate allegations that Plaintiff engaged in the allegedly-protected speech and/or conduct as a private citizen; whether the Amended Complaint contains adequate allegations of protected associational conduct; whether the Amended Complaint contains adequate allegations of a causal link between any protected associational conduct and the alleged retaliation; whether the Defendants may assert a qualified immunity defense; and whether Plaintiff adequately pleads municipal liability under Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 (1978). For the following reasons, the motion to dismiss will be denied without prejudice.

## II. **FACTUAL AND PROCEDURAL HISTORY**[1]

### A. Factual Background

The underlying facts of this suit were recited in the Court's previous Opinion on the earlier motion to dismiss [Docket Item 27] and will not be repeated at length here. The

---

[1] For purposes of the pending motions, the Court accepts as true the version of events set forth in Plaintiff's Amended Complaint, documents explicitly relied upon in the Complaint, and matters of public record. See Schmidt v. Skolas, 770 F.3d 241, 249 (3d Cir. 2014).

Court incorporates the facts as set forth in that Opinion to the extent that the Amended Complaint restates those facts. The Court therefore recounts only the additional allegations contained in the Amended Complaint, writing primarily (if not exclusively) for the parties and assuming the reader's familiarity with the facts, focusing on only those additional facts that are relevant to the Court's determination.

Plaintiff, a police officer with the Pennsauken Police Department and an active member of the labor union representing Pennsauken police officers (the Fraternal Order of Police ("FOP")), alleges that he was retaliated against for his speech and/or conduct advocating a move to a twelve-hour-shift for Pennsauken police officers, and/or his union association in relationship to the union's advocacy of that position in violation of his First Amendment rights and 42 U.S.C. § 1983. (Am. Compl. ¶¶ 256, 257.)

Plaintiff was hired by the Pennsauken Police Department in 2003, and in or around late 2009 to early 2010, Pennsauken and its police department "began considering switching police officers to twelve hours shifts." Id. ¶¶ 11, 15, 55. As Plaintiff describes, this issue implicated not only internal disputes between police officers and the Department regarding hours, but also public safety (the switch to twelve-hour shifts would enable enough police coverage so that one of Pennsauken's

six [districts] would have a police officer assigned to it overnight, whereas without twelve-hour shifts, only five out of six [districts] had such coverage on any given night) and the municipal budget (not having twelve-hour shifts led to Pennsauken being required to pay substantial overtime wages to police officers that Plaintiff believed would be alleviated with the proposed change). Id. ¶¶ 16, 23, 27, 34-51.

"Throughout the first half of 2010, Foster learned more about the issue and became adamant in his support of twelve hour shifts." Id. ¶ 56. Although many of Plaintiff's supervisors were against the switch to twelve-hour shifts and "regularly spoke out against the switch," Plaintiff "actively campaigned and advocated in favor of switching[,]" "arguing that the change would improve officer safety, public safety, and save the municipality a substantial sum of money." Id. ¶¶ 18-19, 21, 23.

Plaintiff also alleges that he "associated with the FOP in their efforts to switch to twelve hour shifts" and that he "was an active member of FOP leadership, and advocated for the switch through his association with the FOP[,]" thereby "exercising his First Amendment rights in two ways[:]" "First, Foster would regularly speak out in favor of twelve hour shifts, clearly articulating his belief that it was the best option for public safety and for the citizens of Pennsauken" (including "regular criticism" of his supervisor for not supporting the switch) "as

a private citizen criticizing public leaders for failing to embrace a necessary public policy"; and secondly, "Foster exercised his First Amendment rights . . . by freely associating with his union--the FOP[,]" becoming "a leader in their union and their efforts to push for twelve hour shifts[,]" representing (at the election of his co-workers) "his shift at union meetings focused on developing the new contract that would include twelve hour shifts[,]" performing both of these alleged First Amendment activities ("his own private speech" and "his association with his union") in advocating for the switch "because it would serve the best interest of the public." Id. ¶¶ 24-33.

Plaintiff alleges that his advocacy was aimed not only at his coworkers but also "regularly" "to other citizens[,]" as his "interest in twelve hour shifts went well beyond his employment as a Pennsauken police officer, and was rooted in what he felt was best for Pennsauken township[,]" because he had previously lived there for eighteen years, and, at the time, his mother, "siblings, relatives, and life-long friends still lived in Pennsauken." Id. ¶¶ 50-54. He describes, in the summer of 2010, advocating for the switch to (and convincing) two Pennsauken police officers, stating that he "focused on the benefits" to them as "Pennsauken resident[s]--namely, the increased safety and the savings in the public budget." Id. ¶ 60-65. Plaintiff

alleges that it was during the summer of 2010 that "it was
discovered and well known by FOP leadership [sic] (including the
Defendants), that Foster was speaking out in favor of twelve
hour shifts to [those] Pennsauken residents" (and police
officers). Id. ¶ 67.

He advocated for the same to his family members during the
summer and fall of 2010, including his mother and sister
(specifically focusing on the increased public safety that would
result in the Fourth District of Pennsauken, where they lived),
"because he felt it was an important issue for Pennsauken
residents" and urged them to support the switch publicly
"because he felt the community should be educated on and
supportive of the measure." Id. ¶¶ 68-75. He made some of these
comments in front of his then-brother-in-law, as well, who
relayed Plaintiff's remarks to Sgt. Lenny Rebilas of the
Pennsauken Police Department, who told Defendant Coffey "that
Foster was speaking as a private citizen in favor of twelve hour
shifts to citizens of Pennsauken." Id. ¶¶ 76-84. Plaintiff also
mentions speaking to two other residents (the Brownells) who
were active community members and convincing them to support the
switch. Id. ¶¶ 85-89.

Similarly, Plaintiff advocated for his position in favor of
the switch at a social Halloween party hosted by a fellow police
officer at his home on October 30, 2010, which was attended by

officers and their families, as well as "many Pennsauken residents, not only police officers," who were present for the discussion and heard Plaintiff's advocacy which, Plaintiff again alleges, "was at a function with many non-police Pennsauken residents and focused on why the policy benefited the public at large." Id. ¶¶ 90-100. Plaintiff alleges that the leadership of the Police Department (including the Defendants) learned about the party, the lively debate that ensued there, and that Plaintiff was advocating in favor of twelve-hour shifts. Id. ¶¶ 99-100.

Also in the fall of 2010, Plaintiff alleges he convinced a former twelve-hour shift opponent (a fellow officer) to support the switch "as one private citizen to another, both of whom were concerned about family members who lived in Pennsauken," on the grounds that the switch "would increase public safety" and "would have a positive impact on the municipal budget." Id. ¶¶ 101-110.

Plaintiff alleges that his "advocacy continued even after the twelve hour shifts were implemented" and he "worked toward the implementation of twelve hour shifts by associating with his union -- the FOP." Id. ¶¶ 111-12.

Plaintiff alleges that, although he was a FOP member when he joined the Department, "he did not become actively involved in the FOP's activities or a member of its leadership until the

fall of 2010[,]" when he became a shift leader for the union, whose role "was to attend meetings, and then convince members of his shift to support union positions, such as the twelve hour shifts." Id. ¶¶ 113-15. As part of that role, Plaintiff names three people whom he "lobbied" to support twelve hour shifts. Id. ¶¶ 116-17.

Plaintiff also served as "an alternate on the union's negotiating team for the collective bargaining negotiations that included the twelve hour shifts"; although he "never was needed to attend the negotiations," he "frequently met with the negotiating team to discuss issues relating to the CBA--most prominently, the twelve hour shifts," and relayed news and concerns between the negotiating team and other union members. Id. ¶¶ 118-20.

Plaintiff alleges that, "[p]rior to the debate over the twelve hour shifts, Defendant Coffey did not concern himself with FOP dealings and did not hold any animosity towards the FOP" (although neither he nor Defendant Probasco were FOP members); the debate over twelve-hour shifts, however, led to "many contentious meetings" between Coffey and "FOP leadership," involving Coffey and other Police Department supervisors "arguing against the twelve hour shifts." Id. ¶¶ 123-25.

Plaintiff alleges that "Coffey than attempted to improperly influence the FOP, even though he was not a member[,]" "vot[ing]

9

in an FOP executive board election, even though he was not permitted to do so" and "constantly sen[ding] the FOP president memo after memo, harassing the president and trying to get him against twelve hour shifts." Id. ¶¶ 126-28. When these tactics did not influence the FOP away from supporting twelve hour shifts, "Coffey began to retaliate against the FOP and against anyone who associated with the FOP[,]" focusing particularly on "FOP leadership." Id. ¶¶ 129-30.

Twelve hour shifts, despite the alleged opposition from some in Department leadership, were implemented in 2011; however, Plaintiff claims, "the animosity escalated" as Defendants Coffey and Probasco (and other Department leadership) "continued to be vocally opposed to the switch"; Plaintiff "continued to advocate for twelve hour shifts even after they went into effect[,]" including advocating for twelve hour shifts at a different party in summer of 2011, where several police officers were still "debat[ing] about twelve hour shifts-- including whether the election would be reversed." Id. ¶¶ 131-39.

Plaintiff alleges that Defendants began retaliating against him "[i]mmediately following the implementation of twelve hours shifts" by (primarily) "taking meritless disciplinary action against" Plaintiff, when he had never been disciplined "[p]rior to the campaign for twelve hour shifts." Id. ¶¶ 140-42; 143-192

(describing several incidents of alleged retaliation prior to chain of events leading to Plaintiff's ultimate removal).

As part of a campaign of retaliation (detailed in the Court's earlier Opinion), Plaintiff alleges that Defendant Probasco "compared Foster to all the other 'babies' in the department that caused their own problems--a reference to the other officers who advocated for twelve hour shifts" and "stated that Foster was going to be his 'project' now." Id. ¶¶ 156-57.

In one incident, on our around June 14-15, 2011, Plaintiff went to a two-day training class with two other officers, neither of whom had advocated for twelve hour shifts; those officers "were reassigned days off and given training days for the two days of the class" and "were given the benefit of not having to use their own time off because of it[,]" whereas Plaintiff "was not permitted to reassign days or use training days, and had to use two holidays." Id. ¶¶ 166-70.

After more incidents of what Plaintiff characterizes as retaliation (id. ¶¶ 171-92 (including an incident where twenty-five disciplinary charges were given to "officers who had advocated for twelve hour shifts, while other officers who did not advocate for twelve hour shifts were not charged" regardless of the fact that some who were charged, like Plaintiff, did nothing wrong, id. ¶¶ 183-91)), Plaintiff was accused of falsifying his logbook in a manner he contends was pretextual

and targeted at him because of his advocacy for twelve hour shifts, due to alleged discrepancies in his logbook for June 4-5, 2014, and was ultimately removed from his position. Id. ¶¶ 193-255.

Plaintiff alleges that there "is no policy, procedure, or custom as to how Pennsauken's officers prepare their activity logs, or that specifies which clock to use" and it is therefore "common for activity logs to have inaccuracies as officers switch clocks and do not have a uniform method for filling them out." Id. ¶¶ 207-08. Plaintiff alleges that he was targeted by Coffey for review of his log book; his log sheets "were the only ones that" Coffey "had questions about"; that when he adequately answered Coffey's first challenge to his log sheets, Coffey asked the Internal Affairs Officer to investigate the situation because Coffey "was hoping to find something he could charge Foster with in continuing retaliation for his advocacy of twelve hour shifts." Id. ¶¶ 209-18.

The investigation continued through July 2, 2014, when the IA officer questioned Plaintiff, who blamed his use of several different (apparently inaccurate) clocks to fill out his log book on the night in question; Plaintiff alleges that the IA officer did not ask him about the different clocks or to explain alleged discrepancies because the IA officer "was not interested in a fair investigation"; "[a]s an ally to Defendant Coffey,

[the IA officer] Defendant Gehring was simply carrying out Coffey's mission to retaliate against Foster." Id. ¶¶ 222-26. The IA officer recommended charges to Defendant Connor, another "ally to Defendant Coffey" who pursued disciplinary charges against Plaintiff, which Plaintiff alleges, "both collectively and individually, were brought in retaliation for Foster's exercise of his First Amendment Rights." Id. ¶¶ 227-34.

Plaintiff alleges that "[o]ther police officers on duty the morning of June 5, 2014 were at HQ as long as Foster, and had discrepancies in their log books, but were not disciplined[,]" naming two officers whose "logs were not consistent with the video from that evening[,]" one of whom received a written reprimand, and the other a one day suspension, whereas Plaintiff "was suspended and Defendant Pennsauken sought termination"; Plaintiff contends that this constituted "selective enforcement" that "was motivated by a desire to retaliate against Foster[,]" as the other two officers "did not exercise their First Amendment rights by advocating for twelve hour shifts." Id. ¶¶ 235-44.

Plaintiff alleges that, after the charges against him were filed, he "tried to meet with Pennsauken's Township Administrator in the hopes of resolving them" because he believed them "to be a meritless form of retaliation." Id. ¶ 245. Plaintiff "requested a meeting" that was subsequently

held with Plaintiff, "the Public Safety Director, the Township Administrator, and Officer Biazzo in his capacity as the union representative[,]" where Plaintiff "complained of the Chief's 'furious campaign to destroy' him." Id. ¶¶ 246-47. However, he "was told there was nothing they could do to help him, and that he would have to wait for the process to play out." Id. ¶ 248. Plaintiff alleges that, one to two weeks later, Coffey recommended Plaintiff "receive an additional disciplinary charge for being a 'repeat offender[,]'" allegedly "in retaliation for Foster exercising his First Amendment rights in going to complain to the Township Administrator." Id. ¶¶ 249-50. Plaintiff was ultimately removed from his position on May 22, 2015. Id. ¶¶ 252.

**B. Procedural Background**

**1. Case to Date and Instant Motions**

On March 22, 2013, Plaintiff, along with six other active members of the FOP, filed a lawsuit before Judge Renee Bumb alleging that Defendants Coffey, Probasco, the Township of Pennsauken, along with the Township Administrator Ed Growchowski, had retaliated against them for their exercise of First Amendment rights. Killion v. Coffey ("Killion I"), No. 13-

1808, 2015 WL 7345749, at *1-2 (D.N.J. Nov. 19, 2015).[2] The

Killion I plaintiffs alleged that these and other actions by the

defendants were motivated by a desire to retaliate against the

plaintiffs for their advocacy in favor of a proposal to

implement twelve-hour shifts for police officers. Id. at *2. The

plaintiffs claimed that this violated 42 U.S.C. § 1983 (Count I)

and the New Jersey Civil Rights Act (Count II). Id.

On November 19, 2015, Judge Bumb dismissed the complaint in

Killion I without prejudice, for failure to adequately plead

that the plaintiffs' advocacy for twelve-hour shifts was

constitutionally protected or that the defendants' conduct

toward plaintiffs was motivated by retaliation. Id. at *1. Judge

Bumb gave the plaintiffs twenty-one days to amend their

complaint. Id. at *11. Five of the seven plaintiffs refiled an

amended complaint, but Plaintiff Foster was not among them.[3]

Instead, after the deadline to amend the Killion I complaint had

lapsed, Plaintiff filed a separate action in this Court on

August 22, 2016, alleging (inter alia) that the retaliation

---

[2] The Killion I complaint included all the facts outlined supra
that predate the initial filing of that complaint in March of
2013. Id. at *1-2, *10.
[3] The amended complaint of the plaintiffs who chose to refile
Killion I was dismissed with prejudice for failure to state a
claim. Killion v. Coffey, No. 13-1808, 2016 WL 5417193, at *13
(D.N.J. Sep. 27, 2016)("Killion II"). Judge Bumb's dismissal of
the complaint was recently affirmed by the Third Circuit in a
non-precedential opinion. Killion v. Coffey, 696 F. App'x 76 (3d
Cir. 2017).

against him culminated in the log-book incident described above and his termination. [Docket Item 1 ¶¶ 158-71.] Plaintiff claimed that the Defendants, through their alleged retaliation, deprived him of his First Amendment rights of free speech and association, in violation of 42 U.S.C. § 1983. (Id. at ¶¶ 174-75.)

This Court previously determined in Foster v. Twp. of Pennsauken, No. 16-5117, 2017 WL 2780745, *5-9 (D.N.J. June 27, 2017) that Plaintiff's Complaint was not barred by the doctrines of res judicata or collateral estoppel [Docket Item 27 at 12-26], but dismissed the Complaint without prejudice, finding that Plaintiff did not adequately allege claims of retaliation for exercising his First Amendment rights of speech and association, id. at 26-44.

Plaintiff subsequently filed the Amended Complaint [Docket Item 29], seeking relief for his charges (Count III), suspension (Count II), and termination (Count I) from the logbook incident, which he alleges was motivated by retaliation for his exercise of the First Amendment rights of speech and association, in violation of 42 U.S.C. § 1983. Id. at ¶¶ 255-301. He also seeks relief for the disproportionate charges filed against him as compared to other officers who did not advocate for twelve-hour shifts (Count IV) and the "unjustified" decision to seek termination rather than other forms of discipline (Count V). Id.

at ¶¶ 302-354. Count VI is a parallel claim asserted against John Doe defendants. Id. at ¶¶ 355-68.

Defendants filed this Motion to Dismiss [Docket Item 32], and Plaintiff filed a Response in Opposition [Docket Item 36], to which Defendants filed a Reply [Docket Item 39]. By leave of the Court [Docket Item 41], Plaintiff filed a short sur-reply [Docket Item 42].

### 2. Collateral Estoppel-Related Effect of Decisions of Administrative Law Judge and Appellate Division

Subsequently, Defendants filed a letter requesting leave to file supplemental briefing in further support of its Motion to Dismiss. [Docket Item 43.] This request was made after the Appellate Division of the Superior Court of New Jersey affirmed the final agency decision by the Civil Service Commission upholding an Administrative Law Judge's decision to remove Plaintiff from the Pennsauken Police Department; Defendant argues that this is relevant to the instant motion as the Appellate Division's judgment was "final and non-appealable" and their collateral estoppel defense, previously rejected by this Court as premature, "is now ripe." Id. at 1 (citing Bridge v. Fogelson, 681 F. App'x 137 (3d Cir. 2017)).

Plaintiff opposed this request, as he asserted that it was "based on a fundamental misstatement of the facts": although Defendants contend that "retaliation was a central theme to

Douglas Foster's defense in the administrative hearing[,]" it "undisputabl[y]" "was not[.]" [Docket Item 44 at 1.] Accordingly, according to Foster, the Appellate Division "was not presented with nor did it consider the issue of retaliation"; and because "that issue was not reviewed by the state court, preclusion would be inappropriate," citing Edmundson v. Borough of Kennett Square, 4 F.3d 186, 189 (3d Cir. 1993).

Per the filings included by the parties, the Appellate Division affirmed the ALJ's decision because it found that the ALJ's findings were supported by the record, and therefore were "entitled to [its] deference" when the ALJ 1) concluded that Plaintiff's log book "undisputed[ly]" was incorrect; 2) "deduced" that Plaintiff "covered" the half-hour when he "either had to leave the time unaccounted for or list himself at headquarters for some reason that he might not be able to justify, or for no reason at all" "by asserting in an official record that he was on patrol . . . , which of course he was not"; and 3) "meticulously debunked" Plaintiff's contention that the inaccuracy "resulted from inaccurate clocks" and found Plaintiff's story "simply not credible[.]" [Docket Item 44-1 at 3, In the Matter of Douglas Foster, No. A-1826-16T3, 2018 WL 2011656, at *1-*2 (N.J. Super. App. Div. May 1, 2018).] The court noted its "limited appellate role" and "extend[ed] a

strong presumption of reasonableness' to an administrative agency's exercise of its statutorily delegated responsibility[,]" concluding that "the ALJ's findings were well-supported by the record and that this decision was not arbitrary, capricious or unreasonable." Id. at *1 (quotations omitted).

The Court will address Defendant's request for leave to file a supplemental brief more fully in a letter that shall be filed to the docket separately from this Opinion. The Court notes that, while the parties dispute the application of the doctrine of collateral estoppel to the claims at issue here, there is a further, more fundamental dispute about the contours of the First Amendment claims pressed by Plaintiff. The present opinion and order are aimed at settling that dispute, and leaving for further briefing and future decision by this Court the narrower question of how the specific factual circumstance at issue here on this point of collateral estoppel (namely, that the ALJ found and the Appellate Division affirmed that Plaintiff was removed for cause) will affect the maintenance of Plaintiff's claims and the course of this case. Accordingly, the Court denies without prejudice Defendant's request to file supplemental briefing regarding collateral estoppel, in accordance with the Letter filed to the docket. In short, this Opinion addresses all issues the parties have briefed, and

leaves to future briefing and analysis the collateral estoppel effects of the Appellate Division's affirmance of the ALJ's decision upholding Foster's termination for cause.

## III. STANDARD OF REVIEW

Pursuant to Rule 8(a)(2), Fed. R. Civ. P., a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Specific facts are not required, and "the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Erickson v. Pardus, 551 U.S. 89, 93 (2007) (citations omitted). While a complaint is not required to contain detailed factual allegations, the plaintiff must provide the "grounds" of his "entitle[ment] to relief", which requires more than mere labels and conclusions. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).

A motion to dismiss under Rule 12(b)(6), Fed. R. Civ. P., may be granted only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court concludes that the plaintiff failed to set forth fair notice of what the claim is and the grounds upon which it rests. Id. A complaint will survive a motion to dismiss if it contains sufficient factual matter to "state a claim to relief that is plausible on its face."

Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009).  Although a court must accept as true all factual allegations in a complaint, that tenet is "inapplicable to legal conclusions," and "[a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." Id. at 678.

## IV.  DISCUSSION

The Court previously ruled that Plaintiff's earlier Complaint adequately alleged: that Plaintiff engaged in speech on a matter that may be of public concern [Docket Item 27 at 30-33]; that Defendants unjustifiably engaged in adverse conduct towards him that could constitute retaliation, see Pickering v. Bd. of Ed. of Township High Sch. Dist. 205, 391 U.S. 563, 568-74 (1968) [Docket Item 27 at 33-35]; and that the Complaint adequately alleged a causal link between Plaintiff's allegedly protected speech and the alleged retaliation (id. at 35-39). See Foster, 2017 WL 2780745, at *11-13.

In contrast, the Court found that Plaintiff's Complaint did not adequately plead: that Plaintiff engaged in the allegedly-protected speech or conduct as a private citizen (id. at 27-30); that Plaintiff engaged in protected associational conduct (id. at 40-42); and that there was a causal link between Plaintiff's allegedly protected associational conduct and the alleged retaliation (id. at 42-44). The Court noted Defendants'

qualified immunity argument but did not reach that issue in light of the disposition it reached. (Id. at 44-45.) See Foster, 2017 WL 2780745, at *10, *14-16.

The Amended Complaint attempts to address these defects; Defendants argue that Plaintiff's Amended Complaint is likewise unsuccessful and that a dismissal with prejudice is now appropriate. In the alternative, Defendants argue that the individual Defendants are entitled to qualified immunity, and/or that the Amended Complaint does not state a claim for municipal liability pursuant to Monell. The Court addresses these arguments in turn.

## A. First Amendment Retaliation (Freedom of Speech): Speech or Conduct as a "Private Citizen"

Defendants argue that Plaintiff has again failed to adequately plead a retaliation claim that would entitle him to relief. To state a First Amendment retaliation claim under Section 1983, Plaintiff must allege that (1) he engaged in a protected activity, (2) the retaliatory action was sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) there was a causal link between the plaintiff's conduct and the defendant's retaliation. Thomas v. Independence Twp., 463 F.3d 285, 296 (3d Cir. 2006); Lauren W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007); Killion, 696 F. App'x at 77-78.

Defendants claim that Plaintiff has failed to cure the defect of the previous complaint in alleging the specific facts required to show that his conduct in advocating for twelve-hour shifts was protected private speech of a public employee under the First Amendment. [Docket Item 32 at 15-23.] Plaintiff asserts that the details of his advocacy are sufficiently pled to establish that it constituted protected speech. [Docket Item 36 at 11-23.]

When speaking on conditions of their employment, public employees – including police officers – are entitled to First Amendment protections only when speaking about public affairs under particular circumstances. Garcetti v. Ceballos, 547 U.S. 410, 417 (2006). A public employee's speech is protected by the First Amendment when (1) in making it, the employee spoke as a private citizen, (2) the statement involved a matter of public concern, and (3) the government employer lacked adequate justification for differential treatment of the employee relative to any other member of the general public. Hill v. Borough of Kutztown, 455 F.3d 225, 241-42 (3d Cir. 2006)(citing Garcetti, 547 U.S. at 417); Killion, 696 F. App'x at 78; Knight v. Drye, 375 F. App'x 280, 282 (3d Cir. 2010).

The Supreme Court has held that a public employer may restrict speech that "owes its existence" to the public employee's professional responsibilities without infringing upon

that employee's First Amendment rights. Garcetti, 547 U.S. at 421-22. Thus, public employees who make statements "pursuant to their official duties" are not private citizens for the purposes of a First Amendment retaliation claim. Id. at 421. See also Lane v. Franks, 134 S. Ct. 2369, 2378 (2014)("Whereas speech [by a public employee] as a citizen may trigger protection [under the First Amendment, the [Garcetti] Court held that 'when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.'")(quoting Garcetti, 547 U.S. at 421).

To determine whether an employee's speech was made pursuant to his official duties, courts evaluate whether the speech fell within the individual's job responsibilities, whether it related to special knowledge or experience acquired on the job, whether it was made inside or outside the work place, and whether it concerned the job's subject matter. Houston v. Twp. of Randolph, 934 F. Supp. 2d 711, 727-28 (D.N.J. 2013). But see Garcetti, 547 U.S. at 420 (2006) (noting that statements made inside the workplace rather than publicly are not dispositive of whether the employee spoke as a private citizen); Lane, 134 S. Ct. at 2379 (2014) (clarifying that a public employee's speech concerning information acquired by virtue of special knowledge

or experience from his employment is only one non-dispositive factor out of many).

In _Lane_, the Court held that an employee who provides truthful sworn testimony, compelled by subpoena, outside the scope of his ordinary job responsibilities, is protected by the First Amendment. _Id._ at 2378. There, it was undisputed that providing sworn testimony was outside the petitioner's job responsibilities, and the Court expressed no opinion about the applicability of its decision to employees within whose job responsibilities it was to provide sworn testimony. _Id._ at 2378 n.4. The _Lane_ Court ruled that "the Eleventh Circuit read _Garcetti_ far too broadly" when it "reasoned that, because Lane learned of the subject matter of his testimony in the course of his employment with CITY, _Garcetti_ requires that his testimony be treated as the speech of an employee rather than that of a citizen. It does not." _Lane_, 134 S. Ct. at 2379 (internal citation omitted). The Court distinguished _Garcetti_, where the petitioner's alleged protected speech was

> made pursuant to the employee's "official responsibilities" because "[w]hen [the employee] went to work and performed the tasks he was paid to perform, [he] acted as a government employee. The fact that his duties sometimes required him to speak or write does not mean that his supervisors were prohibited from evaluating his performance." 547 U.S. at 422, 424.

> But _Garcetti_ said nothing about speech that simply relates to public employment or concerns information learned in the course of public employment or concerns

information learned in the course of public employment.
The Garcetti Court made explicit that its holding did
not turn on the fact that the memo at issue "concerned
the subject matter of [the prosecutor's] employment,"
because "[t]he First Amendment protects some
expressions related to the speaker's job." Id. at 421.
In other words, the mere fact that a citizen's speech
concerns information acquired by virtue of his public
employment does not transform that speech into
employee--rather than citizen--speech. The critical
question under Garcetti is whether the speech at issue
is itself ordinarily within the scope of an employee's
duties, not whether it merely concerns those duties.

Lane, 134 S. Ct. at 2379. See also Lane, 134 S. Ct. at 2383

(Thomas, J., concurring)("Because petitioner did not testify to

'fulfil[l] a [work] responsibility,' Garcetti, supra, at 421, he

spoke 'as a citizen,' not as an employee.").

The Court in Lane found 1) that the petitioner was speaking

as a private citizen (and not "pursuant to [his] official

duties," per Garcetti) on a matter of public importance, id. at

2379-80; and 2) that the respondent did not have "'an adequate

justification for treating the employee differently from any

other member of the public' based on the government's needs as

an employer," citing Garcetti, 547 U.S. at 418 and Pickering,

391 U.S. at 568-74.

The Court nevertheless agreed that the individual

defendant, Franks, was entitled to qualified immunity because,

"at the time he fired Lane," "Eleventh Circuit precedent did not

preclude Franks from reasonably holding" the belief "that a

government employer could fire an employee on account of

testimony the employee gave, under oath and outside the scope of his ordinary job responsibilities" and "no decision of this Court was sufficiently clear to case doubt on the controlling Eleventh Circuit precedent." <u>Lane</u>, 134 S. Ct. at 2381. The Court stated that, at "best, Lane can demonstrate only a discrepancy in Eleventh Circuit precedent, which is insufficient to defeat the defense of qualified immunity." <u>Id.</u> at 2383.

Defendants, here, argue that Plaintiff has not sufficiently alleged in the Amended Complaint facts that, if taken as true, would suffice to allow for a finding that he engaged in speech advocating for twelve-hour shifts as a citizen, rather than pursuant to his job responsibilities. The Court disagrees.

A panel of the Third Circuit, in its non-precedential opinion in <u>Killion</u>, described "its prior holdings, in line with those of other circuits" that find "that First Amendment activity might be considered part of a public employee's official duties--and thus not exercised in one's capacity as a private citizen--if it embodies 'special knowledge' acquired through the job. <u>See</u> <u>Foraker v. Chaffinch</u>, 501 F.3d 231, 240 (3d Cir. 2007)(citing similar holdings issued by the Fifth and Ninth circuits), <u>abrogated on other grounds by</u> <u>Borough of Duryea v. Guarnieri</u>, 564 U.S. 379 (2011)." <u>Killion</u>, 696 F. App'x at 78-79. At the outset, the Court notes that <u>Killion</u> contemplates that such activity "might" be considered as part of the employee's

official duties (implying, of course, that it "might" not be) if it "embodies" (i.e., suggesting a relationship closer than that of mere association or connection) "special knowledge" "acquired through the job." It is by no means clear that Plaintiff's advocacy of twelve-hour shifts could fairly be said (much less when every reasonable inference is to be taken in his favor at this pleading stage) to "embody" special knowledge he gained as a police officer (e.g., overnight coverage, vel non, of Pennsauken's six districts, or how often overtime was paid that could otherwise be avoided if twelve-hour shifts were adopted). The Court looks to this line of cases to square their holdings and rationales with Lane and its progeny.

Foraker, a 2007 (i.e., pre-Lane) Third Circuit opinion, addressed whether two state troopers were "functioning within the scope of their employment duties either when they made their statements [concerning hazardous conditions at the Firearms Training Unit and governmental corruption, misconduct, and mismanagement] to the State Auditor or complained up the chain of command" under Garcetti. Foraker, 501 F.3d at 238, 239. That question was "presented in detail at a jury trial," id. at 240, and the court determined that "[r]eporting problems at the firing range was among the tasks that Price and Warren were paid to perform. Their positions in the DSP required them to report up the chain of command, and their positions as instructors who

regularly used and performed light maintenance on the equipment at the range on a daily basis put any environmental concerns there within the scope of their routine operations." Id. at 241-42.

The court stated: "We recognize that giving statements to the State Auditor was not part of their everyday duties . . . . However, Price explained that he spoke to the auditors because '[i]t was my duty to speak with the auditors. . . . ' Although this speech was compelled by their employer, this fact alone does not locate the speech within the realm of Price and Warren's job duties. Rather, what is dispositive is that the prior statements of Price and Warren within the chain of command prompted the order to speak with the State Auditor. Because the speech that motivated the order was within their job duties, the responsibility to respond to the subsequent order was also within the scope of their duties." Id. at 243.[4]

---

[4] In support of its holding, the court cited the decisions of the Fifth Circuit (per curiam) in Williams v. Dallas Indep. Sch. Dist., 480 F.3d 689 (5th Cir. 2007) and the Ninth Circuit in Freitag v. Ayers, 468 F.3d 528 (9th Cir. 2006), cert. denied, 549 U.S. 1323 (2007). In Williams, the Fifth Circuit "foreclose[d] the retaliation claim of a high school athletic director who was discharged after writing a memo to his principal concerning the handling of school athletic funds" because, applying Garcetti, it held "that it was within Williams' 'daily operations' to manage the athletic department, and because he needed information on the athletic accounts in order to be able to do that, his memorandum to his superior concerning accounts was necessary for him to complete his job. [Williams, 480 F.3d] at 694. The [c]ourt noted that this outcome

was dictated by the fact that 'Williams had <u>special knowledge</u> that $200 was raised at a basketball tournament,' and that he was '<u>experienced</u> with standard operating procedures for athletic departments." <u>Id.</u> (emphasis added [in <u>Foraker</u>])." <u>Foraker</u>, 501 F.3d at 240. The <u>Foraker</u> court found that "Price and Warren were acting within their job duties when they expressed their concerns up the chain of command because they needed to have a functioning bullet trap to conduct their educational programs and it was their special knowledge and experience with the bullet trap that demonstrated their responsibility for ensuring its functionality by reporting problems to their superiors." <u>Id.</u>

In <u>Freitag</u>, per <u>Foraker</u>, the Ninth Circuit held that the reports submitted by a female corrections officers "documenting sexual harassment by prisoners and inaction on the part of her superiors" "were pursuant to her official duties[,]" "[468 F.3d] at 546[,]" but excluded from that determination "a letter she wrote to the Director of the California Department of Corrections and Rehabilitation explaining the hostile work environment she had encountered" and "remanded that issue to the District Court. <u>Id.</u>" <u>Foraker</u>, 501 F.3d at 240. The Third Circuit stated: "Apart from the minor factual distinctions between a prison guard's duty to write internal reports about prisoner misconduct and her supervisors' dilatory response and Price and Warren's responsibility to report required bullet trap maintenance, <u>Freitag</u> helps to illustrate the connection between Price and Warren's speech and their job duties[,]" citing the "fact-intensive nature of this inquiry" and noting that "the question of whether a particular incident of speech is made within a particular plaintiff's job duties is a mixed question of fact and law." <u>Id.</u> "[T]he controlling fact in the case at bar is that Price and Warren were expected, pursuant to their job duties, to report problems concerning the operations at the range up the chain of command. . . . [and] were likewise expected to report truthfully to the State Auditor upon being ordered to do so." <u>Id.</u> at 241.

Because the <u>Killion</u> court looked to <u>Foraker</u>'s invocation of "special knowledge" to show that a given act of speech was made "pursuant to official job duties," and because that doctrine stemmed from <u>Williams</u>, this Court looks to <u>Williams</u>'s analysis for further guidance. In <u>Williams</u>, the Fifth Circuit noted that

> Williams's statements in his memoranda focus on his
> daily operations. He needed information regarding the
> athletic account so that he could "operate the
> athletic department based on standard operating
> procedures and norms throughout the State of Texas."
> He accused the office manager of "hurt[ing his]

ability to provide . . . student/athletes with
critical items and/or materials necessary for
competition." Moreover, Williams was responsible for
buying sports equipment and for arranging and paying
tournament fees. Because the office manager and
principal were in charge of allocating and monitoring
the athletic accounts . . . in order for Williams to
purchase equipment and enter competitions, he needed
to consult with his superior about his budget. We thus
find that Williams's speech was made in the course of
performing his employment.

Simply because Williams wrote memoranda, which were
not demanded of him, does not mean he was not acting
within the course of performing his job. He needed
account information so that he could properly execute
his duties as Athletic Director, namely, taking the
students to tournaments and paying their entry fees.
The memoranda were not written from Williams's
perspective as a "father" and "taxpayer." Unlike
Pickering, whose "position as a teacher in the
district did not qualify him to speak with any greater
authority than any other taxpayer," Pickering, 391
U.S. at 1736, Williams had special knowledge that $200
was raised at a basketball tournament. He was also
experienced with standard operating procedures for
athletic departments. Even his language accusing the
principal of engaging in "network of friends and house
rules" was part-and-parcel of his concerns about the
program he ran.

We thus hold that Williams's memoranda to the office
manager and principal Wright were written in the
course of performing his job as Athletic Director;
thus, the speech contained therein is not protected by
the First Amendment.

Williams, 480 F.3d at 694. See also Charles v. Grief, 522 F.3d
508, 513-14 (5th Cir. 2008)(distinguishing Williams and
rejecting as dispositive defendant's position that where
employee's speech "concerned 'special knowledge' that he had
obtained through his employment at the Commission," Garcetti
precluded that speech from First Amendment protection; noting
that "[t]o hold that any employee's speech is not protected
merely because it concerns facts that he happened to learn while
at work would severely undercut First Amendment rights"; and

In contrast to Foraker (and the Third Circuit's citation to
its test in Killion, 696 F. App'x at 78, including the "special
knowledge" element), precedential and non-precedential Third
Circuit opinions have directly applied Lane (and Garcetti) to
the "practical" "inquiry," Garcetti, 547 U.S. at 424, of whether
public employees were speaking as citizens or "pursuant to"
(again, per Garcetti) their job responsibilities (i.e., as
employees).

In Dougherty v. Sch. Dist. of Philadelphia, a precedential
Third Circuit opinion, the court found that the plaintiff "did
not speak 'pursuant to his official duties'" when he made
certain disclosures to a newspaper regarding a matter that he
learned of through the course of his employment. 772 F.3d 979,
988 (3d Cir. 2014). "Unlike the employees in Garcetti, Foraker,
and Gorum[ v. Sessoms, 561 F.3d 179 (3d Cir. 2009)], nothing
about Dougherty's position compelled or called for him to
provide or report this information, whether to the School

---

finding that the speech (unlike in Garcetti and Williams "was
not made in the course of performing or fulfilling his job
responsibilities, was not even indirectly related to his job,
and was not made to higher-ups in his organization . . . but was
communicated directly to elected representatives of the people";
and describing necessary "nexus" between "job duties" and the
speech); Dougherty, infra, 772 F.3d at 988 (describing Gorum as
finding unprotected under the First Amendment "an employee's
technically-off-duty speech related to 'special knowledge' or
'experience' acquired through his de facto job duties" as Gorum
was "a de facto advisor to students with disciplinary issues").

District, the press, or any other source." Id. (internal

citations and quotations omitted). Applying Lane, the court

stated: "Lane reinforces Garcetti's holding that a public

employee may speak as a citizen even if his speech involves the

subject matter of his employment[,]" and stated that

"Appellants' argument" that Lane's holding was "limited to [the]

context" of "compelled testimony" was "misguided." Dougherty,

772 F.3d at 990. The Third Circuit continued: "If anything, Lane

may broaden Garcetti's holding by including 'ordinary' as a

modifier to the scope of an employee's job duties. See Mpoy[ v.

Rhee,] 758 F.3d [285,] 294-95 [(D.C. Cir. 2014)]('[T]he use of

the adjective "ordinary"--which the [C]ourt repeated nine times-

-could signal a narrowing of the realm of employee speech left

unprotected by Garcetti.')[,]" but concluded that "that question

is not before us today." Id. Finally, the court concluded, on

the Appellants' qualified immunity argument, that,

> [v]iewing the facts the District Court identified in
> the light most favorable to Dougherty, we find that
> the illegality of the Appellants' actions was
> sufficiently clear in the situation they confronted.
> Since at least 1967, "it has been settled that a State
> cannot condition public employment on a basis that
> infringes the employee's constitutionally protected
> interest in freedom of expression." Connick[ v.
> Myers,] 461 U.S. [138,] 142 [(1983)]; see also Rankin[
> v. McPherson,] 483 U.S. [378,] 383 [(1987)](finding
> the same principle "clearly established"). In the case
> at bar, Dougherty's particular type of speech--made as
> a concerned citizen, purporting to expose the
> malfeasance of a government official with whom he has
> no close working relationship--is exactly the type of

> speech deserving protection under the _Pickering_ and
> _Garcetti_ rules of decision and our subsequent case
> law. . . . Thus, Appellants had fair notice that their
> retaliation against Dougherty's constitutionally
> protected speech would not be shielded by qualified
> immunity. . . .
>
> Given the citizen-like nature of Dougherty's
> disclosure to _The Philadelphia Inquirer_, the lack of
> close working relationships with either Dr. Ackerman
> or Dr. Nunery, and the disputed issue of fact with
> regard to the cause of the disruption, it is
> sufficiently clear that Dougherty's speech was
> protected under the First Amendment. "When the balance
> of cognizable interests weighs so heavily in an
> employee's favor, our cases make plain that the law is
> clearly established." _McGreevy[ v. Stroup_,] 413 F.3d
> [359,] 367 [(3d Cir. 2005)]. We conclude, therefore,
> that Appellants are not entitled to qualified
> immunity.

_Dougherty_, 772 F.3d at 993-94

The Third Circuit next applied _Lane_ (and _Dougherty_) in

_Flora v. Cty. of Luzerne_, 776 F.3d 169 (3d Cir. 2015), and ruled

that 1) "[w]hether a particular incident of speech is made

within a particular plaintiff's job duties is a mixed question

of fact and law" (citing _Dougherty_, 772 F.3d at 988) and "there

was a factual dispute as to whether Flora's job duties

encompassed making the statements at issue,"; and 2) "'[t]he

critical question under _Garcetti_ is whether the speech at issue

is itself _ordinarily_ within the scope of an employee's duties,

not whether it merely concerns those duties.' [_Lane_,] 134 S. Ct.

at 2379 (emphasis added)." _Flora_, 776 F.3d at 175, 178.

The defendants in _Flora_ cited the "special knowledge"
element discussed in _Foraker_ and _Gorum_, but the court stated
that those cases

> considered how the employee learned of the information
> as only one non-dispositive factor among many. Indeed,
> [we have] never applied the "owes its existence to"
> test . . . and for good reason: this nearly all-
> inclusive standard would eviscerate citizen speech by
> public employees simply because they learned the
> information in the course of their employment, which
> is at odds with the delicate balancing and policy
> rationales underlying _Garcetti_.
>
> To this end, it bears emphasis that whether an
> employee's speech "concern[s] the subject matter of
> [his] employment" is "nondispositive" under _Garcetti_.
> 547 U.S. at 421. This is because the First Amendment
> necessarily "protects some expressions related to the
> speaker's job." _Id._ In fact, as the Supreme Court
> recently reiterated, speech by public employees "holds
> special value _precisely because_ those employees gain
> knowledge of matters of public concern through their
> employment." _Lane_, 134 S. Ct. at 2379 (emphasis
> added). . . .

_Flora_, 776 F.3d at 177-78 (quoting _Dougherty_, 772 F.3d at 988-
89).

_Flora_ reiterated _Lane_ in its holding that "the term
'official responsibilities' means the responsibilities undertook
when he 'went to work and performed the tasks he was paid to
perform,' which did not, in that case, encompass testifying in
legal proceedings. . . . The Court therefore concluded that
giving grand jury testimony was not part of that employee's
'ordinary job responsibilities' even though the testimony
'relate[d] to [the employee's] public employment or concern[ed]

35

information learned during that employment.' Id. at 2378
(emphasis added)." 776 F.3d at 178. The court ruled that the
district court, in framing the test under Garcetti as whether
the statements "related to" the plaintiff's employment, erred:
not only was this error apparent with the Flora Court having
"the benefit of Lane and Dougherty when it ruled, Garcetti alone
should have steered [the district court] away from applying the
'related to' standard. With the further light that Lane and
Dougherty provide, the proper framing of the question is whether
[the plaintiff's speech and/or actions] were within Flora's
ordinary job duties as the Chief Public defender, not whether
they concerned or were related to those duties. Lane, 134 S. Ct.
at 2379." Flora, 776 F.3d at 179.

Finally, the court, in applying Lane to the facts in Flora
noted that the plaintiff "allege[d] that his obligations as an
attorney, rather than as the Chief Public Defender, compelled
him to make the statements at issue." Id. at 180. This was one
factor that led the Third Circuit to state that a
"straightforward application of Lane leads us to conclude that,
given those allegations, Flora's speech [which involved filing a
lawsuit and making public statements] . . . was not part of his
ordinary responsibilities--it was not part of the work he was
paid to perform on an ordinary basis[,]" which was to represent
indigent clients. Id. This was so notwithstanding that "his

speech was partially aimed at vindicating the rights of indigent criminal defendants" and "may have, indirectly, benefitted his clients," because those facts do "not bring the speech within the realm of his ordinary job duties" (comparing the case to Pickering, 391 U.S. at 568, and Dougherty, 772 F.3d at 988-89): "To view it otherwise would unduly restrict First Amendment rights, because reporting malfeasance or misfeasance will regularly benefit an employee in the execution of his job duties by, presumably, removing impediments to proper government functioning." Id.

In Jerri v. Harran, 625 F. App'x 574 (3d Cir. 2015), a panel of the Third Circuit found that some statements by a fire chief were made as an employee and others were made as a citizen. The court stated that when a fire chief "made his complaints directly to the defendants, who are all Township officials[,]" he was speaking as an employee rather than as a citizen because "[o]ne of his job responsibilities as chief was to liaise with the Township on matters that concerned [the fire company], and he did so when, for example, he 'complained to Defendants' about 'waste occurring on the part of Defendants with respect to a non-functional fire training center.' And, as a general matter, expressing concern about an employer's actions 'up the chain of command,' Foraker, 501 F.3d at 240, particularly when the employee is not advocating 'ideas,

principles and projects,' <u>Hill v. Kutztown</u>, 455 F.3d at 240,
that a supervisor opposes, is unlikely to be protected. When
Jerri, Sr. sought to bring Defendants' attention to alleged
waste that harmed [the fire company], he was doing what a fire
chief is meant to do, and thus he cannot be said to have acted
in those contexts as a citizen." 625 F. App'x at 580-81. The
court stated that it is not whether the speech "concerned his
employment as fire chief" that was dispositive; "[i]ntead, the
crucial question is whether the plaintiff is 'expected, pursuant
to [his or her] job duties,' to make the relevant speech.
<u>Foraker</u>, 501 F.3d at 241[,]" and found that certain other speech
by the plaintiff was made as a citizen "when he complained about
the boat business to all and sundry." <u>Jerri</u>, 625 F. App'x at
581. The court declined to affirm on qualified immunity grounds,
stating that "[a]s <u>Garcetti</u> and our precedential opinions make
clear, a person who speaks outside his job duties speaks as a
citizen." <u>Id.</u>

 Compare, then, <u>Fraternal Order of Police, Lodge 1 v. City
of Camden</u>, 842 F.3d 231 (3d Cir. 2016), a precedential opinion
wherein the Third Circuit reversed the District Court's grant of
summary judgment on the plaintiff-police officers' state
whistleblower ("Conscientious Employee Protection Act" or
"CEPA") claims, 842 F.3d at 243. The plaintiffs also alleged
First Amendment retaliation, alleging that they engaged in

protected speech by "writing, among other things, 'QUOTA[]S ARE
ILLEGAL![]'" "on police department counseling forms[.]" Id.
However, the court stated, "the plaintiff-officers were not
speaking as citizens when they wrote on the counseling forms.
Citizens do not complete internal police counseling forms.
Rather, completing counseling forms as part of the police
disciplinary process falls under officers' official duties.
Therefore, the plaintiff-officers' speech here 'owe[d] its
existence to [their] public employee[] professional
responsibilities[,]" and the court affirmed the grant of summary
judgment on the First Amendment retaliation claim. Id. at 244,
citing Gorum, 561 F.3d 179, 185 (3d Cir. 2009)(citation
omitted).

Defendants assert that Gorum controls here:

Foster adds that his "interest" in the shifts "went
beyond his employment" because he had been a resident
of Pennsauken and has family and friends that live
there. Regardless of what motivations prompted his
advocacy, the fact remains that Foster learned about,
and had the ability to speak on, the municipal budget
and public safety improvements related to twelve-hour
shifts precisely because of the experience he gained
as a police officer in that Township. This is closely
akin to plaintiff's speech in Gorum[]. There,
plaintiff asserted that the assistance he provided to
a student during a disciplinary hearing was protected
citizen speech because it "went beyond his specified
resposnibilities in the Collective Bargaining
Agreement." Nonetheless, the [c]ourt found that
plaintiff's assistance of the student came within the
scope of his official duties because it was his
'special knowledge of, and experience with, the DSU
disciplinary code' that made him an advisor to DSU

> student. <u>Id.</u> at 186 (rejecting plaintiff's First
> Amendment retaliation claim and affirming the District
> Court's grant of summary judgment). Likewise, even if
> Foster's advocacy for the shifts went beyond his
> specified job duties, his ability to advocate was
> entirely the product of the knowledge and experience
> he acquired as a Pennsauken police officer.

[Docket Item 32 at 17-18.]

In light of <u>Lane</u>, <u>Dougherty</u>, and <u>Flora</u>, this Court can definitively say that this is not the test under <u>Garcetti</u>. See <u>Dougherty</u>, 772 F.3d at 989 (Appellants "replace <u>Garcetti</u>'s 'pursuant to official duties' test with one that precludes First Amendment protection for speech that 'owes its existence to a public employee's professional responsibilities[.]' . . . After plucking <u>Garcetti</u>'s language to canonize a new standard, Appellants rely on <u>Gorum</u> to argue that, because the content of Dougherty's speech was gained from 'special knowledge' and 'experience' with the camera project entrusted to Dougherty, his speech 'owes its existence to' his professional duties. <u>These arguments ask us to read Garcetti far too broadly</u>.")(citations omitted; emphasis added). Moreover, the Third Circuit in <u>Dougherty</u> characterized <u>Gorum</u>'s holding as simply an application of <u>Garcetti</u>'s "fact-intensive"[5] "practical inquiry": "We concluded that, although advising at disciplinary hearings was not listed in the professor's formal job description, his

---

[5] <u>Foraker</u>, 501 F.3d at 240.

extensive knowledge and experience with disciplinary actions as
a de facto disciplinary advisor rendered that speech within his
job duties nonetheless. . . . Accordingly, Appellant's attempt
to preclude First Amendment protection from Dougherty's report -
- a duty absent from both his de facto and de jure
responsibilities--is inapt." 772 F.3d at 989 (citations
omitted).

Moreover, in City of Camden, it was the form (or forum) of
the speech that led to the conclusion (under Garcetti) that it
the speech was part of the plaintiffs' job responsibilities, 842
F. 3d at 244--not the fact that it related to the special
knowledge they had gained as police officers. Cf. Dougherty, 772
F.3d at 994 (citing plaintiff's "citizen-like nature" of
disclosure to local newspaper); Garcetti, 547 U.S. at 423-24
("Employees who make public statements outside the course of
performing their official duties retain some possibility of
First Amendment protection because that is the kind of activity
engaged in by citizens who do not work for the government. The
same goes for writing a letter to a local newspaper, see
Pickering, 88 S. Ct. at 1731, or discussing politics with a co-
worker, see Rankin, 483 U.S. at 378. When a public employee
speaks pursuant to employment responsibilities, however, there
is no relevant analogue to speech by citizens who are not
government employees.")(emphasis added).

Similarly, it was on the basis of a particular "practical inquiry" that the Third Circuit affirmed a finding that speech was made as an employee and not as a citizen where the plaintiff explicitly stated that his "role as 'the person responsible for training' the RIT included the 'duty to correct errors and deviations in [RIT] procedures[,]'" thereby rendering his "complaints regarding RVFD's training and dispatch protocols for its RIT" ones "made 'pursuant to [his] official duties[.]'" Houston v. Twp. of Randolph, 559 F. App'x 139, 142 (3d Cir. 2014). It was not that the complaints were based on his special knowledge, but rather that it was his particular role "to correct errors and deviations"--which his statements were meant to do, as he made them "up the chain of command." Houston v. Twp. of Randolph, 934 F. Supp. 2d 711, 728 (D.N.J. 2013)(citing Foraker, 501 F.3d at 240).[6] Similarly, the Third Circuit ruled in Kimmett v. Corbett, 554 F. App'x 106, 112 (3d Cir. 2014), that certain speech and conduct by the plaintiff, a supervisor, (but not all) "was made pursuant to his job duties."[7]

---

[6] To the extent the District Court in Houston cited as justification for this finding the fact that all of Houston's speech "ar[ose] from and relate[d] to special job-related experience," 934 F. Supp. 2d 711, 728 n.17, such findings are dicta, as the court also found that the plaintiff "does not seem to allege" that he was suspended in retaliation for the complaints he made to "fellow firefighters and others" rather than up the chain of command.

[7] To the extent that Kimmett's approach to assessing whether speech was made as a citizen or as an employee varies from that

The Court finds that Plaintiff's Amended Complaint alleges advocacy that was of the character of citizen speech and not speech made "pursuant to" Plaintiff's job responsibilities as a Pennsauken police officer. While his advocacy may have related to internal working conditions at the Police Department, it also related to issues of public concern like public safety and the municipal budget. See Foster, 2017 WL 2780745, at *11. While his substantive position on the issue may have stemmed from the special knowledge he gained as a police officer, it was neither de jure nor de facto his "job responsibility" as a Pennsauken police officer to have an opinion about, make a recommendation about, administer, or determine the proper length of police officer shifts. See Dougherty, 772 F.3d at 988 ("[N]othing about Dougherty's position compelled or called for him to provide or report this information")(citation omitted). And while he may have advocated his position to his supervisors (among others), he did not have a specific, supervisory or ordinary responsibility, as a Pennsauken police officer, to report issues or problems he saw with the length of shifts "up the chain of command" as in Foraker. Moreover, he also advocated, on the same grounds upon which he now premises his claim that his speech

_____

described in Lane, Dougherty, and Flora, this Court is bound by the latter holdings and not by Kimmett. See Third Circuit L. App. R., Appendix I, I.O.P. 5.7.

related to a matter of public concern to Pennsauken residents generally (per the Amended Complaint) to: fellow officers (cf. Garcetti, 547 U.S. at 423[8]); to family members; and to other members of the Pennsauken community. Whether he reached their "hearts and minds" is of no decisive importance, as Defendants urge [Docket Item 32 at 22]. What is important about his audience and the character of his advocacy is that it shows that his speech was of a type that could be pressed by any non-employee citizen. Cf. City of Camden, 842 F.3d at 244; Garcetti, 547 U.S. at 423-24.

Accordingly, the Court, applying Lane, finds that Plaintiff's speech, as alleged in the Amended Complaint, was not made "pursuant to" Plaintiff's "official responsibilities." Lane, 134 S. Ct. at 2379. Nor was the advocacy of the switch to twelve-hour shifts "ordinarily within the scope of" his "duties" as a Pennsauken police officer, although it "concern[ed] those duties." Flora, 776 F.3d at 169 (citing Lane, 134 S. Ct. at 2379). The Court notes that, while such advocacy by Plaintiff may have been also in part pursuant to his duties as a member of FOP leadership, this does not alter the Court's analysis under

---

[8] "Employees who make public statements outside the course of performing their official duties retain some possibility of First Amendment protection because that is the kind of activity engaged in by citizens who do not work for the government. The same goes for writing a letter to a local newspaper or discussing politics with a co-worker[.]" (citations omitted)

*Garcetti* and *Lane*; although the plaintiff in *Flora* felt "compelled" to engage in the speech at issue, he felt compelled to do so "as a lawyer" rather than as "the Chief Public Defender." 776 F.3d at 180. This did not alter the Third Circuit's conclusion that he adequately alleged that his speech was made "outside the scope of his ordinary job responsibilities" as the Chief Public Defender. Id. at 179, 180.

Here, too, the Court finds that the Amended Complaint alleges speech and advocacy of the switch to a twelve-hour shift by Plaintiff to several parties that was "outside the scope of" Plaintiff's "ordinary job responsibilities" and was therefore made as a citizen, entitling him to the protection of the First Amendment. See *Flora*, 776 F.3d at 179 ("Because *Lane* now controls, . . . the responsibility of a district court in evaluating whether a public employee's speech was made as a private citizen is to ask whether the speech at issue was 'outside the scope of his ordinary job responsibilities.' [*Lane*, 134 S. Ct.] at 2378."); cf. *Matthews v. City of New York*, 779 F.3d 167, 174 (2d Cir. 2015)("Matthews's speech to the Precinct's leadership in this case was not what he was 'employed to do,' unlike the prosecutor's speech in *Garcetti* . . . . Such policy-oriented speech was neither part of his job description nor part of the practical reality of his every day work. . . . [T]he NYPD Patrol Guide . . . lists 20 specific duties, but none

45

includes a duty to provide feedback on precinct policy or any other policy-related duty. . . . Matthews had no role in setting policy; he was neither expected to speak on policy nor consulted on formulating policy.").

Moreover, although the Court already found that Plaintiff adequately alleged a plausible causal link between his advocacy for twelve-hour shifts and the alleged retaliation, see Foster, 2017 WL 2780745, at *12-13, Defendants here submit that Plaintiff does not adequately allege a causal link between the advocacy Plaintiff undertook as a citizen (including his private advocacy to Pennsauken residents and his own family members) and the alleged retaliation he faced, arguing that all Plaintiff has alleged is that Defendants were aware of that private advocacy, and that "[m]ere knowledge is insufficient to establish causation in a retaliation case[,]" citing Perna v. Twp. of Montclair, No. Civ. A. 05-4464 (JLL), 2009 WL 2778389, at *6 (D.N.J. Aug. 31, 2009) and Davila v. City of Camden, 66 F. Supp. 3d 529, 535 (D.N.J. 2014) [Docket Item 32 at 22-23.] The Court does not find this argument persuasive. Defendants concede, for purposes of this argument, that they knew of Plaintiff's private speech, but Plaintiff does not rely simply on the fact that they knew of his advocacy to link his advocacy with the alleged retaliation he suffered; Plaintiff's Amended Complaint cites to other evidence of the retaliatory animus (e.g., different levels

of discipline for supporters compared to non-supporters,
Probasco calling supporters "babies," etc.), and the invocation
of the knowledge Defendants had about his private advocacy
merely serves as a prerequisite for showing a causal link; after
all, Defendants could not bear a retaliatory animus if they did
not know about Plaintiff's protected conduct. Here, Plaintiff is
alleging (and Defendants are apparently conceding) that they did
in fact know, clearing the way for a finding of a causal link.
See Ambrose v. Twp. of Robinson, 303 F.3d 488, 493-94 (3d Cir.
2002)(Third Circuit "h[e]ld" that if decisionmakers were
"unaware of" protected speech, "it could not possibly have been
a substantial or motivating factor" in the adverse employment
decision and the concomitant "First Amendment retaliation claim
would necessarily fail").[9]

**B. First Amendment Retaliation (Freedom of Association)**

The Court next turns to Plaintiff's advocacy for the shifts
in his position as a representative for the union. The Court
previously stated that this advocacy "was not done as a private

---

[9] While the Court denies without prejudice Defendant's request
for supplemental briefing to further argue for dismissal on
collateral estoppel grounds, see supra Section II.B.2., the
Court notes that, should Plaintiff be precluded from arguing
that he was not terminated for cause upon application of the
doctrine of collateral estoppel, he shall be required to plead
(and ultimately, prove) that, notwithstanding that for-cause
termination, retaliatory animus was also a substantial or
motivating factor in that (or any) adverse employment decision
made by Defendants.

citizen, because those statements were made pursuant to his duties as a representative of the union in negotiating their new contract. See Hill v. City of Phila., 331 F. App'x 138, 142 (3d Cir. 2009) (affirming the district court's grant of summary judgment to defendants on grounds that the plaintiff did not show that he was acting as a private citizen in speaking as a union representative); see also Beresford v. Wall Twp. Bd. of Educ., No. 08-2236, 2010 WL 445684, at *6 (D.N.J. Feb. 3, 2010) (dismissing plaintiff's retaliation claim because his speech was made in his capacity as the negotiator of his union)[,]" and that Plaintiff did not adequately allege a causal link between the alleged retaliation and his union activities specifically. Foster, 2017 WL 2780745, at *10; *14-15. Plaintiff was given the opportunity to address these pleading deficiencies in an Amended Complaint. With the benefit of the additional allegations of the Amended Complaint, the Court finds that Plaintiff adequately alleges that he was retaliated against in violation of his First Amendment right to free association.

Similarly to a free-speech retaliation claim, a public employee who claims that his employer retaliated against him for exercise of his right to associate (here, Plaintiff's union-related activities) must allege that (1) he was engaged in constitutionally-protected conduct, (2) his employer undertook an adverse employment action against him, and (3) there exists a

causal link between his protected conduct and the employer's action whereby the protected conduct was a "substantial" or "motivating factor" in the government employer's adverse employment decision. Rode v. Dellarciprete, 845 F.2d 1195, 1204 (3d Cir. 1988) (quoting Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)).

The Court finds that Plaintiff has adequately pled that Defendants took an adverse employment action against him, and must therefore assess whether the Amended Complaint states a claim that, first, Plaintiff engaged in constitutionally-protected free association with regard to his union related activities, and that, second, there is a causal link between those activities and the adverse employment action.

### 1. Allegations of Associational Conduct

The Court, in assessing the previous Complaint in this case, fleetingly addressed whether Plaintiff's conclusory Complaint alleged that his union-related activities constituted protected associational conduct before "focusing" on the question of allegations of the causal link. Foster, 2017 WL 2780745, at *10 (describing allegations regarding union-related conduct as "bare-boned and conclusory").

Because Plaintiff now alleges substantially more detail with regard to his union-related activities, the Court more squarely addresses whether the Amended Complaint in its present

form alleges a plausible claim that Plaintiff engaged in protected associational conduct. The Court finds that it does.

"Public employees are, like all citizens, entitled to associate freely without retaliation by the government for doing so." Ferraioli v. City of Hackensack Police Dep't, No. 09-2663 (SRC), 2010 WL 421098, at *6 (D.N.J. Feb. 2, 2010)(citing Smith v. Ark. State Highway Employees, Local 1315, 441 U.S. 463, 465 (1971)(per curiam) and Bradshaw v. Twp. of Middletown, 296 F. Supp. 2d 526, 544 (D.N.J. 2003), aff'd, 145 F. App'x 763 (2005)). "[S]ome union activity presumably comes within the right to associate for expressive purposes. See, e.g., Roberts v. United States Jaycees, 468 U.S. 609, 622 (1984)('implicit in the right to engage in activities protected by the First Amendment [is] a corresponding right to associate with others in pursuit of a wide variety of political, social [and] economic . . . ends")." Hotel and Restaurant Employees and Bartenders Intern. Union Local 54 v. Read, 832 F.2d 263, 265 (3d Cir. 1987).

"[I]t is well-settled that First Amendment protections extend to the right to associate with a union." Mrazek v. Stafford Twp., Nos. 13-1091(FLW) & 14-5945(FLW), 2016 WL 5417197, at *10 (D.N.J. Sept. 28, 2016)(citations omitted). "Plainly efforts of public employees to associate together for the purpose of collective bargaining involve associational

interests which the first amendment protects from hostile state action." <u>Labov v. Lalley</u>, 809 F.2d 220, 222-23 (3d Cir. 1987)(citing <u>Hague v. C.I.O.</u>, 307 U.S. 496 (1939)). <u>See also</u> <u>Bradshaw v. Twp. of Middltown</u>, 296 F. Supp. 2d 526, 544 (D.N.J. 2003)(First Amendment "right to freely associate with others without fear of retaliation" "extends to union-related activity")(citing <u>Suppan v. Dadonna</u>, 203 F.3d 228, 230-31, 236 (3d Cir. 2000); <u>Robb v. City of Philadelphia</u>, 733 F.2d 286, 295 (3d Cir. 1984); <u>McGrogan v. SEPTA</u>, No. 01-1342, 2002 WL 1586979, at *2 (E.D.Pa. July 19, 2002)); <u>Glass v. Snellbaker</u>, No. 05-1971(JBS), 2007 WL 1723472, at *4 (D.N.J. June 14, 2007)("The right to associate, whether with a union or other organization, is protected by the First Amendment. . . . Further, nothing in the <u>Garcetti</u> case casts doubt upon the First Amendment associational protections of public employees expressing themselves through lawful union activities, such as meetings and grievances").

In <u>Bradshaw</u>, the court recognized that the plaintiff stated a claim of protected union activity where he alleged "that in his capacity as a member of the Board of Trustees of the" union, "he 'took a stand' against'" one defendant's "proposal to change the police officers' uniforms and make the officers pay half the cost." 296 F. Supp. 2d at 545. To the extent that he was retaliated against for that action, the court held that he

"stated a claim for retaliation for engaging in the protected conduct of union activity" against those defendants. Id. See also Crane v. Yurick, 287 F. Supp. 2d 553, 560 (D.N.J. 2003)(plaintiff "easily satisfies the first element of the retaliation test, as his union-related speech is protected under the First Amendment" because it involved a matter of public concern; specifically, it "involved a central union activity, the negotiation of a new collective bargaining agreement . . . . The First Amendment's protection of the right to freedom of speech extends broadly over union activities. See Thomas v. Collins, 323 U.S. 516 (1945); Thornhill v. Alabama, 310 U.S. 88 (1940); Hotel & Restaurant Employees & Bartenders Intern. Union Local 54 v. Read, 832 F. 2d 263, 265 (3d Cir. 1987). . . . Plaintiff's speech clearly related to his union activities, as it involved contract negotiations, and it was also clearly a matter of public concern.").

In a case where the plaintiffs alleged that they were discriminated against for their political affiliation based on their support for a specific candidate in a union election, the court "reviewed two lines of cases discussing freedom of association under the First Amendment": "[o]ne line" that "deals generally with one's right to associate with groups engaged in expressive activity" (citing Roberts, 468 U.S. at 611 and Boy Scouts of Am. v. Dale, 530 U.S. 640, 648 (2000)) and the "other"

dealing "more particularly with discrimination against a public employee for his or her political affiliation" under "the Supreme Court's political patronage trilogy" of <u>Elrod v. Burns</u>, 427 U.S. 347 (1976), <u>Branti v. Finkel</u>, 445 U.S. 507 (1980), and <u>Rutan v. Republican Party of Ill.</u>, 497 U.S. 62, 75 (1990). <u>Ferraioli</u>, 2010 WL 421098 at *6. There, the court found that the alleged retaliatory actions for the plaintiff's support of one union candidate "infringed their First Amendment right in that it burdened their association with a labor union." <u>Id.</u> at *7.

When assessing a free-association retaliation claim, some courts have held, a plaintiff must allege, under Third Circuit precedent, "that the plaintiff must be acting as a private citizen" because such an allegation is "an essential element of a First Amendment Claim, whether it is a freedom of speech claim or a freedom of association claim." <u>Cindrich v. Fisher</u>, 512 F. Supp. 2d 396, 404 (W.D.Pa. 2007)(citing <u>Hill v. Kutztown</u>, 455 F.3d at 241-242). As this question is now squarely before the Court due to the additional allegations in the Amended Complaint regarding Plaintiff's union-related activities, the Court will look closely at this proposition in order to ascertain whether Plaintiff's union-related activities constituted protected associational conduct under the First Amendment.

In <u>Hill v. Kutztown</u>, the plaintiff brought First Amendment retaliation claims based on several incidents of speech, as well

as a claim based on political association. 455 F.3d at 241-243.

The Third Circuit assessed "whether [the plaintiff's]

allegations [we]re sufficient to establish that his constructive

discharge occurred in retaliation for [his] exercise of his

First Amendment rights.

> To state a First Amendment retaliation claim, a
> plaintiff must allege two things: (1) that the
> activity in question is protected by the First
> Amendment, and (2) that the protected activity was a
> substantial factor in the alleged retaliatory action.
> See, e.g., Phyllis Hill v. City of Scranton, 411 F.3d
> 118, 125 (3d Cir. 2005). The first factor is a
> question of law; the second factor is a question of
> fact. Curinga v. City of Clairton, 357 F.3d 305, 310
> (3d Cir. 2004).

Id. at 241.

The Third Circuit first turned to "Hill's [s]peech" and

noted that a "public employee's statement is protected activity

when (1) in making it, the employee spoke as a citizen, (2) the

statement involved a matter of public concern, and (3) the

government employer did not have 'an adequate justification for

treating the employee differently from any other member of the

general public' as a result of the statement he made." Id. at

241-42 (quoting Garcetti, 547 U.S. at 410). Under this heading,

regarding "Hill's Speech," the Third Circuit delineated the

distinction between speaking as an employee and speaking as a

private citizen: namely, that the employee does the latter when

he does not speak "pursuant to [his] official duties." Id. at

242 (citing <u>Garcetti</u>).[10] The court then ruled that, given the posture of the case ("on a 12(b)(6) motion," where "the court examined whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief"), the court would read the complaint "to allege that Hill was speaking [on at least one occasion] 'as a citizen'"; that the court could not determine whether the speech involved a matter of public concern, nor whether the employer "had an adequate justification" for treating Hill differently, but that "Hill has alleged the requisite causality by claiming that his support for the telecommunications project and other projects and ideas the Mayor opposed, was one of the reasons that Mayor Marino retaliated against him" and held that "Hill's First Amendment claim . . . should not have been dismissed at this stage of the proceeding." <u>Id.</u> at 242-43 (citation and emphasis omitted).

The Third Circuit only then turned to Hill's next claim, in a subsection entitled "Hill's political association," stating that "Hill also bases his First Amendment retaliation claim on his support for 'the policies and programs of the previous mayor.'

> To make out a claim of discrimination based on political association, a public employee must allege (1) that the employee works for a public employer in a position that does not require a political affiliation, (2) that the employee maintained a

---

[10] <u>Cf.</u> Section IV.A., <u>supra</u>.

> political affiliation, and (3) that the employee's
> political affiliation was a substantial or motivating
> factor in the adverse employment decision. <u>Goodman v.
> Pa. Tpk. Comm'n</u>, 293 F.3d 655, 663-64 (3d Cir. 2002).

<u>Id.</u> at 243. The court then concluded that Hill could not sustain

such a claim. <u>Id.</u>

This Court therefore does not read <u>Hill v. Kutztown</u> to

directly assess or describe the elements of a First Amendment

free-association retaliation claim (e.g., "public concern";

"private citizen"; "substantial factor"), as it assessed Hill's

direct "First Amendment" retaliation claim only insofar as it

related to his <u>speech</u>, and assessed his <u>association</u> claim under

the rubric of political association discrimination--a cause of

action neither pleaded by, nor directly relevant to, Plaintiff's

free-association retaliation claim in this case.[11]

Given this reading of <u>Hill v. Kutztown</u>, the Court cannot

now fairly state, as the <u>Cindrich</u> court cited (per the

plaintiff's brief in that case, 512 F. Supp. 2d at 404), that

the Third Circuit held in that case that the "private citizen"

requirement of <u>Garcetti</u> applies to free association retaliation

claims as well as free speech retaliation claims.

---

[11] <u>See Goodman</u>, 293 F.3d at 663 (describing this type of First-
Amendment-grounded claim as a "political patronage" claim under
<u>Elrod</u>, 427 U.S. at 372-73; <u>Branti</u>, 445 U.S. at 514-15; and
<u>Rutan</u>, 497 U.S. at 75).

Another court in this District has stated the elements of a First Amendment free-association retaliation claim in more general terms, as follows:

> As with a freedom of speech claim, an employee who raises an adverse employment action based upon the exercise of their associational rights must show that he was engaged in a constitutionally protected activity and that such conduct was a substantial and motivating factor of the [adverse employment action]. [Rode, 845 F.2d at 1204] (citing Mt. Healthy, 429 U.S. at 287). While the activity in question must be protected, the Third Circuit has recognized but not addressed the fact that there is a circuit split as to whether the freedom of association claims are governed by the "public concern" requirement. Sanguigni v. Pittsburgh Bd. of Pub. Educ., 968 F.2d 393, 400 (3d Cir. 1992).

Beresford, 2010 WL 445684 at *5. In Beresford, the court found that the plaintiff did not adduce sufficient evidence to show that his speech was made as a private citizen, rather than pursuant to his union duties, and simply concluded that the plaintiff's "freedom of association claim mirrors his freedom of speech claim in that it relates to the same union speech and attendant circumstances." Id. at *5-7.

Applying this test in the general fashion, it would seem that Plaintiff could adequately allege that he engaged in a constitutionally protected activity (i.e., union leadership activities, including advocating for the twelve-hour shift as part of his duties as a leader in the FOP), and that his union leadership activities (including, or even primarily, his

advocacy for the twelve-hour shift) constituted a substantial and motivating factor in Defendants' alleged course of conduct against him (see infra Section IV.B.2.). Attempting to map Garcetti's "private citizen" requirement onto the question of whether Plaintiff's union leadership activities were conducted as a "private citizen" complicates the matter somewhat, because Plaintiff, arguably, was not engaged in his union-related activities as a private citizen in the same way he advocated for the twelve-hour shifts to his coworkers and other Pennsauken residents as a private citizen. However, the Court nevertheless finds (to the extent such a finding is necessary under Third Circuit precedent) that it would be unwise to hold that Plaintiff's Amended Complaint alleges that his union-related activities (and their consonant associational conduct) were conducted "pursuant to [Plaintiff]'s official duties" and are therefore unprotected under Garcetti.

    As an initial matter, much of the moving force of Garcetti was the concern the Court had for an employer who may need or wish to discipline an employee whose work performance is not up to snuff, notwithstanding that the form of such performance was in the nature of speech or writing. The plaintiff there was disciplined for writing a memorandum, the content of which allegedly displeased his superiors. The Court held that the plaintiff could, notwithstanding the First Amendment, be

"disciplined" (or what the plaintiff styled as "retaliated against") for what was, essentially, his work product, notwithstanding that his work product took the form of speech. Garcetti, 547 U.S. at 422 ("Refusing to recognize First Amendment claims based on government employees' work product does not prevent them from participating in public debate").

Here, there is no allegation that Plaintiff's union leadership activities are analogous to his "work product." Just as it was not necessary, or part of his ordinary duties as a Pennsauken police officer, see Lane and Flora, for Plaintiff to have an opinion on shift lengths (much less advocate that opinion vocally), Plaintiff's allegations in the Amended Complaint do not suggest that it was necessary or part of his ordinary duties as a Pennsauken police officer to undertake the union leadership activities he performed (including advocating for the twelve-hour shift). It follows that those activities did not effectively constitute his work performance or work product as a Pennsauken police officer, upon which Defendants could reasonably require to discipline him.[12] However, Plaintiff was

---

[12] See Montero v. City of Yonkers, 890 F.3d 386, 398 (2d Cir. 2018)(citing Lane and concluding that plaintiff "sufficiently pled" that he "made his remarks as union vice president, a role in which he was not required to serve" although they "may have touched on matters that he learned through the course of his employment" and ruled that the "district court erred in concluding on a motion to dismiss that Montero spoke as an employee" because his speech "was not composed of statements

undoubtedly engaged in this conduct in a way that was closely
linked with his role as a police officer, so in that way, it
might be analytically difficult to conceive of his activities in
this role as having occurred "as a private citizen" under
_Garcetti_. _Cf._ _Garcetti_, 547 U.S. at 421-22 ("Restricting speech
that owes its existence to a public employee's professional
responsibilities does not infringe any liberties the employee
must have enjoyed as a private citizen").

Nevertheless, and secondly, the Court shares the concerns
well articulated by Judge Robinson in _Justice v. Danberg_, 571 F.
Supp. 2d 602, 608 (D. Del. 2008). In that case, the plaintiff, a
corrections officer, asserted "that he was denied [a] promotion
. . . because he engaged in constitutionally protected activity
by associating with a union." _Id._ at 608. The court stated:

> For plaintiff, as a government employee, to engage in
> constitutionally protected activity, he must do so as a
> citizen and not as a government official or agent
> speaking merely in the course of his official
> activities. _Garcetti_, 547 U.S. at 418. Defendants
> contend that plaintiff did not engage in protected
> activity because his union activity was pursuant to his
> official duties as a corrections officer. Defendants
> rely on _Garcetti_, which holds that speech by a public
> employee in the course of his or her official duties is
> not protected under the First Amendment because the
> employee would not be speaking as a "citizen on a

made as a 'means to fulfill' or 'undertaken in the course of
performing' his responsibilities as a police officer[,]" citing
_Weintraub v. Bd. of Educ. of City Sch. Dist. of City of N.Y._,
593 F.3d 196, 203 (2d Cir. 2010), holding instead that "he
engaged in citizen speech for purposes of the First Amendment").

matter of public concern." [footnote 7 omitted; see
infra.] 547 U.S. at 418; see also Connick, 461 U.S. at
147 ("[W]hen a public employee speaks not as a citizen
upon matters of public concern, but instead as an
employee upon matters only of personal interest . . . a
federal court is not the appropriate forum in which to
review the wisdom of a personnel decision taken by a
public agency allegedly in reaction to the employee's
behavior."). Garcetti disallows claims in circumstances
only where the activity is one required by the public
employee's duties since this would necessarily mean the
employee was not speaking as a citizen but as a
government official. 547 U.S. at 418. Put another way,
Garcetti stands for the principle that the Constitution
does not absolutely insulate employees, speaking as
employees, from employer discipline when their
respective interests are in conflict, reflecting the
simple fact that "a government employer may impose
certain restraints on the speech of its employees . . .
that would be unconstitutional if applied to the
general public." City of San Diego v. Roe, 543 U.S. 77,
80 (2004)(per curiam).

Applying this rule to the instant case, the initial
question for the court is whether plaintiff was acting
as a citizen or as an employee when he took part in
the union negotiations. Defendants argue that since
plaintiff is required to be a member of [the union] by
Delaware law, as are all other DOC employees of his
rank or below, plaintiff's activity is not protected.
This is a broad reading of the rule that seeks to
disallow First Amendment protections to government
employees if their activity was related in any way to
their employment, a reading that has been rejected by
a number of courts, including this court, since
Garcetti. [citations omitted.] In the first instance,
while plaintiff was required by Delaware law to be a
member of [the union], he was not required to be a
vice president in the union nor was he required to
even be active in the union beyond that required by
law. Defendants do not identify any evidence that the
job requirements of plaintiff's position as Vacation
Holiday Relief Sergeant include being a vice president
representing MCCC or taking part in collective
bargaining and contract negotiations. Secondly, if the
court were to adopt defendants' interpretation of the
rule, union activity would cease to be a fundamental

right protected under the Constitution, a holding that
would contradict decades of Supreme Court precedent.
[footnote 9 omitted, see <u>infra</u>.] The court declines to
find that <u>Garcetti</u> represents the abrogation of such a
well established right. Consequently, the court finds
that plaintiff was acting as a citizen when
participating in union negotiation activities.

<u>Justice v. Danberg</u>, 571 F. Supp. 2d at 608-10.[13]

The Court, here, similarly finds that the Amended Complaint

adequately alleges that Plaintiff "was acting as a citizen" in

his FOP leadership activities, to the extent such a finding is

---

[13] <u>See also id.</u> at 609 n.7 ("Defendants cite to a recent Third
Circuit opinion, <u>Hill v. Borough of Kutztown</u>, for their
interpretation of the <u>Garcetti</u> rule. 455 F.3d [at] 242-43 . . .
. This reliance is misplaced since the <u>Hill</u> Court affirmed the
dismissal, via <u>Garcetti</u>, of only the portion of Hill's claims
that concerned reporting requirements that he, himself, conceded
were required as 'pursuant to his official duties.' <u>Id.</u> The
Court actually reversed the dismissal of Hill's First Amendment
claim based on other activities that were not affected by his
concession. <u>Id.</u>"); 609 n.9 (citing <u>Thomas v. Collins</u>, 323 U.S.
516, 532 (1945)("Free discussion concerning the conditions in
industry and the causes of labor disputes appears to us
indispensably to the effective and intelligent use of the
processes of popular government to shape the destiny of modern
industrial society."); <u>N.L.R.B. v. Jones & Laughlin Steel Corp.</u>,
301 U.S. 1, 33 (1937)("[T]he right of employees to self-
organization and to select representatives of their own choosing
for collective bargaining or other mutual protection without
restraint or coercion by their employer . . . is a fundamental
right."); <u>United Fed'n of Postal Clerks v. Blount</u>, 325 F. Supp.
879, 883 (D.D.C. 1971)(per curiam), <u>aff'd</u>, 404 U.S. 802
(1971)("The right [of public employees] to organize collectively
and to select representatives for the purposes of engaging in
collective bargaining is . . . a fundamental right."); <u>Labov v.
Lalley</u>, 809 F.2d 220, 222-23 (3d Cir. 1987)("Plainly efforts of
public employees to associate together for the purpose of
collective bargaining involve associational interests which the
first amendment protects from hostile state action.").)

necessary under <u>Garcetti</u> and Third Circuit precedent. There is

no allegation in the Amended Complaint suggesting that

Plaintiff's de facto or de jure job requirements mandated that

he undertake those union leadership activities, including the

advocacy for the twelve-hour shift he engaged in as part of that

role.[14] Further, it would be ironic and contrary to well-

---

[14] <u>Cf. Thomas v. Delaware State University</u>, No. 10-522-GMS, 2014
WL 5020275, at *3-*4 (D. Del. Oct. 6, 2014)(plaintiff complained
of retaliation "for exercising her First Amendment right to
freedom of speech in connection with her union activities[,]"
"<u>i.e.</u>, the grievances she filed on behalf of the union";
defendants claimed that "she was not speaking as a private
citizen on matters of public concern"; court recognized that
plaintiff's "actions as Union President were distinct from her
DSU job obligations, and therefore she spoke as a private
citizen rather than a public employee. . . . Thomas was not
<u>required</u> to serve as AFSCME Union President as part of her DSU
employment, making her activity on behalf of the union that of a
private citizen. A contrary holding would severely undermine
employees' ability to participate in unions without fear of
retaliation, and 'union activity would cease to be a fundamental
right protected under the Constitution, . . . contradict[ing]
decades of Supreme Court precedent[,]'" citing <u>Justice</u>, 571 F.
Supp. 2d at 609-10, and distinguishing <u>Hill v. Phila.</u>, 331 F.
App'x at 142; "acknowledging that it draws a fine distinction,"
court found "that <u>Hill [v. Phila.]</u> did not squarely address the
issue of whether one participating in union activity acts as an
employee or as a citizen. . . . Rather, the Third Circuit
focused on the plaintiff's burden of proof" where it held that
the appellant "fail[ed] to demonstrate" that his union
representation of a third party "is the type of speech which
entitles him to First Amendment protection" and that the
"appellant did not show that he was acting as a citizen in his
union representation"; finding that "the law is not well
defined" but that "Thomas was acting as a private citizen when
filing grievances on behalf of union members"); <u>see also id.</u> at
*3 n.4 (plaintiff only belatedly asserted First Amendment free
association right as basis for alleged retaliation and court
disregarded as improper amendment to claim); <u>Glass</u>, 2007 WL
1723472, at *5 ("In his conversations with the union, Plaintiff

established precedent if Plaintiff's status as a public employee, a requirement for membership in his union, were deemed sufficient to negate the protection of his exercise of the right of association against retaliation.

Accordingly, the Court next turns to allegations of a causal link between Plaintiff's union-related activities (i.e., his alleged protected associational conduct) and the alleged retaliation he suffered.

### 2. Allegations of Causal Link

The Court previously found that, in the original Complaint, although "Plaintiff pleads facts sufficient to infer that his speech in favor of twelve-hour shifts was a substantial or motivating factor in the Defendants' alleged retaliation, he fails to draw the same causal connection between his union association and the retaliation." Foster, 2017 WL 2780745, at *14.

Much of the Court's concern with this claim as pled in Plaintiff's original Complaint centered on the lack of

---

was not acting pursuant to his official duties to the Department, but as an associate of the union"); Montero, 890 F.3d at 398-99 (noting that "some circuits have" "decide[d] categorically" "that when a person speaks in his or her capacity as a union member, he or she speaks as a private citizen")(citing Boulton v. Swanson, 795 F.3d 526, 534 (6th Cir. 2015); Ellins v. City of Sierra Madre, 710 F.3d 1049, 1060 (9th Cir. 2013); Nagle v. Vill. of Calumet Park, 554 F.3d 1106, 1123 (7th Cir. 2009)).

specificity about Plaintiff's personal involvement in the FOP,
and the lack of factual information from which the Court could
infer a causal link between Plaintiff's association with the FOP
and the retaliation against him. Specifically, without Plaintiff
having stated the dates of his association with the FOP (and/or
the date around which his involvement increased to the point of
alleged significance), the Court was unable to assess how
Plaintiff's FOP association squared with the behavior by
Defendants (including its temporal relationship) that was
alleged to constitute retaliation for that association. Foster,
2017 WL 2780745, at *15.

As Plaintiff notes in his Response, the Amended Complaint
now includes the additional allegations that "Plaintiff became
actively involved in the FOP and a member of FOP leadership in
the fall of 2010 when he became a shift leader" (Am. Compl.
¶¶ 113-14); that, as union shift leader, "Plaintiff was
responsible for attending union meetings and convincing
employees to support union positions (including twelve-hour
shifts[,]" id. at ¶¶ 115-17; that Plaintiff also served as an
alternate on the CBA negotiating team, thereby serving as a
"liaison between union members and the negotiating team[,]" id.
at ¶¶ 118-20; and that "Defendant Coffey, who previously did not
interfere with the FOP became incensed with the FOP during the
twelve hour shift debate and began retaliating against FOP

leadership--including the Plaintiff[,]" id. at ¶¶ 124-30. [Docket Item 36 at 8.]

As pled, the Amended Complaint adequately alleges that the Defendants, including Defendant Coffey, retaliated against Plaintiff because of his union-leadership activities. Although Plaintiff may have been an FOP member in the years predating the fall of 2010, the Amended Complaint alleges that it was his increased role in FOP leadership, at the time that FOP was advocating for twelve-hour shifts (and against Defendants' own preference), that coincided with Defendants' pattern of antagonism toward him, a pattern that allegedly culminated in his termination in 2015. Cf. Foster, 2017 WL 2780745, at *13 ("the facts of the chronology of retaliation pled in his Complaint are sufficient for a jury to plausibly infer that the logbook incident was the culmination of Defendants' pattern of antagonism in retaliation for his advocacy for twelve-hour shifts"). Specifically, Plaintiff's allegation that Defendant Coffey's attitude towards the FOP and its members had previously been cordial but noticeably cooled (and was followed by allegedly retaliatory action) once the FOP began to advocate for twelve-hour shifts is sufficient, at this pleading stage of the proceedings, to infer that Plaintiff's association with a union that was effectively now "going up against" Defendant Coffey was part of Defendants' motivation in allegedly retaliating against

Plaintiff shortly thereafter. The Amended Complaint describes Coffey's previous "lack of animosity" towards the FOP before the twelve-hour shift debate; the "many contentious meetings" Defendant Coffey "and other Police Department supervisors" held with FOP leadership about twelve hour shifts; Defendant Coffey's attempt "to improperly influence the FOP" by, e.g., voting "in an FOP executive board election, even though he was not permitted to do so" and "harassing" the FOP president by sending him repeated memoranda; and the allegation that "when influencing the FOP did not work, Coffey began to retaliate against the FOP and against anyone who associated with the FOP," "focus[ing] on FOP leadership." (Am. Compl. ¶¶ 124-30.) The Court further notes that this question of whether the protected conduct was a substantial factor in motivating the alleged retaliatory conduct is a question of fact, making it particularly inapposite for the Court to dismiss this claim on this basis at this stage of the proceedings prior to an opportunity to exchange disclosures and discovery. See Hill v. Kutztown, 455 F.3d at 241.[15]

---

[15] The Court notes that, when other courts dismiss claims on this basis, it tends to be in circumstances where the plaintiff does not adequately allege that the defendant knew of the protected activity, as knowledge is a necessary predicate to a retaliatory animus. In Gorum, the Third Circuit addressed whether summary judgment was appropriate on the question of whether "the protected activity was a substantial factor in the alleged retaliatory action," noting that this "is a question of fact[,]"

Plaintiff adequately alleges that it was his association with the FOP, as it was advocating in favor of the twelve-hour shifts, that led to the retaliatory animus and actions undertaken by Defendant; Plaintiff also adequately alleges that it was his speech as a private citizen, advocating the same,

---

citing Hill v. Kutztown, 455 F.3d at 241. Gorum, 561 F.3d at 184. There, the Third Circuit found that the plaintiff could not "show that his remarks and actions were substantial factors behind President Sessoms's alleged retaliatory decision" where "no evidence exist[ed] that Sessoms had any knowledge of Gorum's" allegedly protected activity. Id. at 188. See also Ambrose v. Twp. of Robinson, 303 F.3d 488, 493-94 (3d Cir. 2002)(Third Circuit "h[e]ld" that if decisionmakers were "unaware of" protected speech, "it could not possibly have been a substantial or motivating factor" in the adverse employment decision and the concomitant "First Amendment retaliation claim would necessarily fail").

In contrast, in Hill v. Kutztown, the Third Circuit found that "Hill has alleged to requisite causality by claiming that his support for the telecommunications project and other projects and ideas the Mayor opposed, was one of the reasons that Mayor Marino retaliated against him" and reversed the grant of dismissal pursuant to Fed. R. Civ. P. 12(b)(6). Hill v. Kutztown, 455 F.3d at 243. See also Crane, 287 F. Supp. 2d at 560-61 (court denied summary judgment where plaintiff "at least creates suspicion as to Defendants' retaliatory motive[,]" noting temporal proximity of alleged protected conduct and retaliatory actions, although defendant "expressly denied any knowledge of Plaintiff's discussions with the Attorney General in his deposition" as the court "believe[d] that this matter should be considered by a jury, and is inappropriate for summary judgment disposition"); Thomas, 2014 WL 5020275, at *5 (plaintiff failed to demonstrate a causal link via a pattern of antagonism where demonstrated "pattern of antagonism" "was not even directed primarily at Thomas" because to "establish a retaliation claim, the pattern of antagonism must be causally connected to--i.e., a product of--the protected activity" and evidence "shows any antagonism" from defendant "was his ordinary demeanor and not causally related to Thomas' specific protected activity").

that led to the retaliation. It is not necessary, to state a retaliation claim, to state that the allegedly motivating conduct was the sole cause of the retaliation; rather, the test is whether the motivating conduct by the plaintiff was "a substantial or motivating factor in the allegedly retaliatory action," Springer v. Henry, 435 F.3d 268, 275 (3d Cir. 2006)(emphasis added). As Plaintiff states, "[t]hroughout discovery and litigation, it could be discovered that speech was the root cause of the retaliation, that associational conduct was the root cause of the retaliation, or that both were root causes of the retaliation." [Docket Item 36 at 24.] To the extent that some future finder of fact may find that the alleged retaliation was, in fact, motivated by Plaintiff's speech as a private citizen but not by his association with the FOP as it advocated the same position Plaintiff did (or vice versa), such a finding is perfectly consonant with the Court's denial of Defendants' 12(b)(6) motion on the same point.[16]

Accordingly, the Court finds that Plaintiff has adequately alleged retaliation in violation of his First Amendment right to

---

[16] See supra, n.9; if Plaintiff is ultimately collaterally estopped from claiming that he was terminated without just cause, he shall be required to plead, and eventually prove, that retaliatory animus for the exercise of his First Amendment right to association was also a substantial or motivating factor in any adverse employment decisions against him made by Defendants, in addition to the misconduct attributed to him by the ALJ and the Appellate Division.

free association, and the Court will deny Defendant's motion as
to that claim.

**C. Qualified Immunity**

Finally, Defendants contend that they are entitled to
qualified immunity even if Plaintiff had stated a valid
retaliation claim on either free speech or free association
grounds. Qualified immunity protects government officials from
standing suit, provided that their conduct "does not violate
clearly established statutory or constitutional rights of which
a reasonable person would have known." Harlow v. Fitzgerald, 457
U.S. 800, 818 (1982); Kelly v. Borough of Carlisle, 622 F.3d
248, 253 (3d Cir. 2010). To defeat qualified immunity, a
plaintiff must (1) have actually asserted a violation of a
constitutional right, and (2) the constitutionality of that
right must have been "clearly established" at the time of the
defendants' alleged infringement. Larsen v. Senate of Com. Of
Pa., 154 F.3d 82, 86 (3d Cir. 1988); Rossiter v. City of
Philadelphia, No. 16-1187, 2016 WL 7478494, at *3 (3d Cir. Dec.
29, 2016) (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)).

"'The relevant, dispositive inquiry in determining whether
a right is clearly established is whether it would be clear to a
reasonable officer that his conduct was unlawful in the
situation he confronted.' Saucier, 533 U.S. at 202. To be
clearly established, the very action in question need not have

previously been held unlawful. <u>Anderson v. Creighton</u>, 482 U.S. 635, 640 (1987). Rather, the 'contours of the right' must be sufficiently clear such that the unlawfulness of the action is apparent in light of pre-existing law. <u>Id.</u>" <u>Dougherty</u>, 772 F.3d at 993. "'Qualified immunity will be upheld on a 12(b)(6) motion only when the immunity is established on the face of the complaint.'" <u>Thomas v. Independence Twp.</u>, 463 F.3d 285, 291 (3d Cir. 2006)(quoting <u>Leveto v. Lapina</u>, 258 F.3d 156, 161 (3d Cir. 2001)). "[A] plaintiff has no obligation to plead a violation of clearly established law in order to avoid dismissal on qualified immunity grounds." <u>Thomas</u>, 463 F.3d at 293. <u>See also</u> <u>Zion v. Nassan</u>, 727 F. Supp. 2d 388, 404 (W.D.Pa. 2010)("Even in applying the <u>Iqbal</u> standard, the Court of Appeals for the Third Circuit has warned that 'it is generally unwise to venture into a qualified immunity analysis at the pleading stage as it is necessary to develop the factual record in the vast majority of cases.' <u>Newland v. Reehorst</u>, 328 F. App'x 788, 791 n.3 (3d Cir. 2009).").

When assessing the "clearly established" prong of the qualified immunity test, it is obviously critically important to frame the inquiry properly: when drawn too broadly, all (or nearly all) alleged violations are "clearly established" (as it is, <u>e.g.</u>, clearly established that a person has a constitutional

right to free speech)[17]; but when drawn too narrowly, the inquiry would seem never to be satisfied unless the precise factual scenario had, however improbably, arisen in the past (where a Court of Appeals or the Supreme Court had ruled that a person in a position analogous to the plaintiff's position in all relevant respects had had his or her constitutional rights violated). Thus, the Court looks to other cases addressing qualified immunity in the First Amendment retaliation context for guidance on the proper frame for the inquiry, as well as the larger question of whether the "immunity is established on the face of" the Amended Complaint here. See Thomas, 463 F.3d at 291.

The Court begins with Lane, as Lane both provides the applicable rule of decision with regard to whether Plaintiff spoke as a citizen or as an employee and found qualified immunity for the individual defendant. In Lane, which was issued on June 19, 2014, the Supreme Court found that the plaintiff alleged retaliation in violation of his constitutional right to free speech under Garcetti and Pickering, but ruled that the

---

[17] See De Ritis v. McGarrigle, 861 F.3d 444, 458 n.12 (3d Cir. 2017)(describing as too "general" the question of "whether a public employee has a clearly established right to 'alleg[e] misconduct or wrongdoing by public officials'" as "[t]hat description of the right" "is so general as to encompass not only cases where speech alleging misconduct or wrongdoing is protected, but also those where it is not[.]")(citing DeRitis v. Roger, 165 F. Supp. 3d 231, 245 (E.D.Pa. 2016); other citations omitted).

individual defendant, Franks, was entitled to qualified immunity because, "at the time he fired Lane," "Eleventh Circuit precedent did not preclude Franks from reasonably holding" the belief "that a government employer could fire an employee on account of testimony the employee gave, under oath and outside the scope of his ordinary job responsibilities" and "no decision of this Court was sufficiently clear to case doubt on the controlling Eleventh Circuit precedent." Lane, 134 S. Ct. at 2381. The Court stated that, at "best, Lane can demonstrate only a discrepancy in Eleventh Circuit precedent, which is insufficient to defeat the defense of qualified immunity." Id. at 2383.

Shortly after Lane was decided, on November 21, 2014, the Third Circuit issued its opinion in Dougherty, 772 F.3d at 982-94. In that case, the plaintiff disclosed alleged misconduct relating to information he learned in the course of his employment as the "Deputy Chief Business Officer for Operations and Acting Chief of Operations for the Office of the Deputy Superintendent" to a local newspaper, and subsequently complained to the FBI, "several state representatives," and "the Office of Inspector General for the U.S. Department of Education." 772 F.3d at 982-83.

The District Court, "[v]iewing the facts in the light most favorable to Dougherty," found his allegations "sufficient to

establish a First Amendment retaliation claim[,]" finding "no evidence 'suggesting [Dougherty's speech] fell within the scope of his duties to recognize the alleged misconduct as such and report it" and concluding that his speech was citizen speech under Garcetti. Id. at 985. The District Court also rejected a qualified immunity defense, finding that the right was "clearly established" and "that a reasonable governmental official would have been on notice that retaliating against Dougherty's speech was unlawful." Id.

The Third Circuit looked to Garcetti and Lane to determine, first, whether Dougherty's speech was protected under the First Amendment, and second, whether qualified immunity served as a defense. Id. at 987-89, 993-94. The Third Circuit found a constitutional violation, and then turned to the qualified immunity inquiry. Id. The court stated that, when "[v]iewing the facts the District Court identified in the light most favorable to Dougherty," "the illegality of the Appellants' actions was sufficiently clear in the situation they confronted[.]" Citing Connick, 461 U.S. at 142, and Rankin, 483 U.S. at 383, the court held that since at least 1967, "it has been settled that a State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." Dougherty, 772 F.3d at 993 (quotation omitted). The court continued: "Dougherty's particular type of speech--made as

a concerned citizen, purporting to expose the malfeasance of a government official with whom he has no close working relationship[18]--is exactly the type of speech deserving protection under the Pickering and Garcetti rules of decision and our subsequent case law." Id. (also citing O'Donnell v. Yanchulis, 875 F.2d 1059, 1060, 1061-63 (3d Cir. 1989); Watters v. City of Phila., 55 F.3d 886, 897-98 (3d Cir. 1995); Baldassare v. New Jersey, 250 F.3d 188, 199-200 (3d Cir. 2001)).

Alternatively, the defendants in Dougherty "contend[ed] that their actions were so close to the constitutional line that it was eminently reasonable for them to conclude they had failed to cross it"; however, the court found "this contention unpersuasive." Dougherty, 772 F.3d at 993-94. Although "both Garcetti and Pickering are fact-dependent inquiries, giving some leeway for termination based on disruptive speech if made pursuant to an employee's job duties, we cannot conduct our analysis with Appellants' desired version of the facts. . . . Given the citizen-like nature of Dougherty's disclosure to The Philadelphia Inquirer, the lack of close working relationships" with two individual defendants whose alleged misconduct

---

[18] The alleged facts that the speech purported to expose the malfeasance of a government official with whom Dougherty had no close working relationship were important factors in the Court's finding that Dougherty passed the Pickering balancing-test analysis. 772 F.3d at 990-93.

Dougherty was reporting,[19] "and the disputed issue of fact with regard to the cause of the disruption,"[20] "it is sufficiently clear that Dougherty's speech was protected under the First Amendment. 'When the balance of cognizable interests weighs so heavily in an employee's favor, our cases make plain that the law is clearly established.' McGreevy, 413 F.3d at 367. We conclude, therefore, that Appellants are not entitled to qualified immunity." Id. at 993-94.

Subsequently, in Flora (which was decided on January 15, 2015), the Third Circuit did not directly conduct a qualified immunity analysis due to the posture of the case. 776 F.3d at 179 n.11. On the merits question, however, the Third Circuit held that "the District Court did not apply the correct test" for distinguishing citizen speech from employee speech "under Garcetti, as Lane has made clear. Lane, 134 S. Ct. at 2379[.] . . . [T]he District Court did not have the benefit of Lane and Dougherty when it ruled . . . With the further light that Lane and Dougherty provide, the proper framing of the question is whether the filing of [Flora's law]suit and [Flora's other] reporting . . . were within Flora's ordinary job duties as the Chief Public Defender, not whether they concerned or were

---

[19] As was relevant to the Pickering balancing test the Third Circuit applied.
[20] Also relevant to the Pickering balancing test.

related to those duties." <u>Flora</u>, 776 F.3d at 178-79. The Third
Circuit expressly did "not decide whether <u>Lane</u> modified or
merely clarified <u>Garcetti</u>." <u>Id.</u> at 179. As the court noted,
"<u>Lane</u> introduced the word 'ordinary' to modify 'job duties' in
the First Amendment retaliation test[,]" but the court did not
decide "whether this new adjective signals a shift in the law
that broadens the scope of First Amendment protection for public
employees" or "merely clarified the <u>Garcetti</u> holding"; the court
had similarly not decided the question of whether <u>Lane</u> modified
<u>Garcetti</u> or not in <u>Dougherty</u>, 772 F.3d at 990-91, and again
declined to do so, simply applying <u>Lane</u> directly to Flora's
actions to determine whether his speech was pursuant to his
ordinary job duties. <u>Flora</u>, 776 F.3d at 179 n.11.

Here, Defendants argue that the individual Defendants are
entitled to qualified immunity because "the right to advocate
for twelve-hour shifts was not 'clearly established.'" [Docket
Item 32 at 32-33.] <u>See also</u> Def. Reply, Docket Item 39 at 13
("There was no clearly established constitutional right to
speech and activity in support of twelve-hour shifts which would
have put Defendants on notice that their alleged conduct was
unlawful.") Defendants further argue that, at the very least,
the position of the individual defendants that their alleged
retaliation was not unlawful was objectively reasonable because
"established law holds that an employee's speech is not

protected if he speaks pursuant to his job responsibilities or based on knowledge or experience gained while in the job[.]" Id. at 14.

However, as discussed supra, the Court does not agree that "established law holds that an employee's speech is not protected if he speaks . . . based on knowledge or experience gained while in the job." Lane, Dougherty, and Flora expressly disclaim this as the operative standard under Garcetti. Instead, those three cases make clear that the question is, instead, whether the employee spoke "pursuant to his job responsibilities," i.e., whether his speech was in the scope of his ordinary job responsibilities. See Lane, 134 S. Ct. at 2379; Dougherty, 773 F.3d at 990; Flora, 776 F. 3d at 179. This was established Supreme Court (and Third Circuit) precedent by, at the latest, January of 2015. Plaintiff was not terminated until the summer of 2015. Moreover, it would be unduly narrow to frame the answer to the question of which right needed to have been "clearly established" as "the right to advocate for a twelve-hour shift"; this is undoubtedly too narrow a framing. Cf. Reichle v. Howards, 566 U.S. 658, 665 (2012)("Here, the right in question is not the general right to be free from retaliation for one's speech, but the more specific right to be free from a retaliatory arrest that is otherwise supported by probable cause").

Instead, the Court is persuaded that the most apt framing of the question is whether the right to speak about a matter related to, but outside the scope of, one's ordinary professional duties on a matter of public concern, free from retaliation, was clearly established when Defendants allegedly retaliated against Plaintiff. The Court is persuaded that, pursuant to Third Circuit precedent (Dougherty and Flora) that clearly explained how Lane clarified (or modified) Garcetti, that the answer is yes.[21]

---

[21] See also Jerri, 625 F. App'x at 581 ("[I]t would be inappropriate to affirm on the basis of qualified immunity" because as "Garcetti and our precedential opinions make clear, a person who speaks outside his job duties speaks as a citizen"); Hunter v. Town of Mocksville, 789 F.3d 389, 397 (4th Cir. 2015)(recognizing Lane as having "admonished lower courts for 'reading Garcetti' and its employee speech implications 'far too broadly'" and reiterating that "the critical question is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties")(internal quotation omitted); Mpoy, 758 F.3d at 294 (recognizing Lane as "holding that an employee's speech is unprotected only when it is within the scope of the employee's 'ordinary job responsibilities' or 'ordinary job duties[]'"); Hurst v. Lee Cty., 764 F.3d 480, 485 (5th Cir. 2014)(plaintiff's statements were "ordinarily within the scope of [his] duties and did not merely concern those duties" and were unprotected pursuant to Lane); Olendzki v. Rossi, 765 F.3d 742, 747 (7th Cir. 2014)("Our circuit has consistently held that when a public employee speaks in his capacity as a union official, his speech is not within the purview of his 'official duties'"); Cutler v. Stephen F. Austin State Univ., 767 F.3d 462, 472 (5th Cir. 2014)(denying qualified immunity where "[s]everal pre-2010 decisions have . . . given the Defendants the 'fair warning' they need. This circuit began the task of embroidering Garcetti's general rule with new fact patterns in 2007"); Matthews v. City of New York, 779 F.3d 167, 173 (2d Cir. 2015)(Pursuant to Garcetti and Weintraub, 593 F.3d at 203-04,

While the Pickering balancing test has been held in other cases to affect the qualified-immunity analysis in analogous contexts,[22] the particular dimensions of the Pickering balancing test that have weighed in favor of (at least) a finding of qualified immunity are not present here, as the Court's relatively simple application of the Pickering balancing test in Foster I illustrates. Foster, 2017 WL 2780745, at *12.

Accordingly, the Court finds Plaintiff's Amended Complaint alleges facts suggesting that Defendants, when they allegedly retaliated against him, violated his clearly-established First Amendment rights to speak as a citizen on matters related to his employment that were nevertheless outside the scope of his duties as a police officer, pursuant to Garcetti, and that his speech (as currently described in the Amended Complaint) was on a matter of public concern (i.e., public safety and municipal budget), a term that has been defined broadly and whose broad

---

holding that "when a public employee whose duties do not involve formulating, implementing, or providing feedback on a policy that implicates a matter of public concern engages in speech concerning that policy, and does so in a manner in which ordinary citizens would be expected to engage, he or she speaks as a citizen, not as a public employee").

[22] See Bifano v. Borough, No. 3:16-0245, 2016 WL 7404610, at *11-*12 (M.D.Pa. Dec. 22, 2016)(qualified immunity appropriate because of "the unique and unclear Pickering balancing that occurs in the law enforcement context as applied to the facts alleged in the plaintiffs' complaint" where "many cases suggest that the Pickering analysis favors the government's interest in speech cases involving police departments")(citations omitted).

definition was well-settled before Defendants embarked on their alleged course of conduct against Plaintiff. See Lane, 134 S. Ct. at 2380 ("Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is a subject of general interest and of value and concern to the public.")(citations omitted). The Amended Complaint adequately alleges that Plaintiff was advocating for the twelve hour shift, specifically as it would improve public safety and municipal fiscal responsibility, in a way (or ways) that were, "beyond debate,"[23] not within the scope of his ordinary job duties as a Pennsauken police officer, and that Defendants knew of his advocacy and its character as going beyond his own personal employment conditions. The Court finds that the Amended Complaint allows for a reasonable inference that it would have been "plainly incompetent"[24] for Plaintiff's employers to believe that part of his "ordinary job responsibilities" were to have an opinion (and to advocate that opinion to "all and sundry"[25]) about the optimal length of shifts as they related to issues of public safety and municipal budgeting.

---

[23] Werkheiser v. Pocono Twp., 780 F.3d 172, 177 (3d Cir. 2015)(quoting Stanton v. Sims, 571 U.S. 3, 6 (2013)).
[24] See Malley v. Briggs, 475 U.S. 335, 341 (1986).
[25] See Jerri, 625 F. App'x at 581.

Moreover, although Defendants argue that it was not clearly established that the content of Plaintiff's speech was a matter of public concern, the Court disagrees. Although the Court is mindful of the (non-binding) cases that "generally recognize that speech regarding working conditions and other issues in union members' employment are personnel matters which are not of interest to the broader community,"[26] the Court also notes the many binding precedents that hold that speech on issues of public safety[27] and municipal budget[28] are, obviously, matters of

---

[26] Palardy v. Twp. of Millburn, No. 15-02089(SDW)(LDW), 2017 WL 2968394, at *5 (D.N.J. July 11, 2017)(citing Thomas, 626 F. App'x at 389; Beresford, 2010 WL 445684 at *6; Garcia v. Newtown Twp., 483 F. App'x 697, 703 (3d Cir. 2012); holding that plaintiff did not speak on matters of public concern where he represented union members in disciplinary matters, in "terms and conditions of employment and in contract negotiation" and engaged in "speech pertain[ing] to matters of employee discipline, promotion, salaries, and work hours").

[27] See, e.g., Watters, 55 F.3d at 895 (efficacy of police employee assistance plan is matter of public concern because it "could have affected the delivery of police services"); Green v. Philadelphia Housing Authority, 105 F.3d 882, 887 (3d Cir. 1997)(testifying voluntarily at a bail hearing as a character witness is a matter of public concern where "the court depends upon accurate testimony by those familiar with the defendant in order to determine whether the defendant is likely to flee or endanger the community"); see also Beyer v. Borough, 428 F. App'x 149, 154 (3d Cir. 2011)(discussion of weapons "relate[s] to issues about the safety of the Duncannon Borough's Police Force, which implicates public safety and extends beyond issues specific to Beyer"). See also Mt. Healthy, 429 U.S. at 284 (affirming as protected by the First Amendment teacher's disclosure of memorandum regarding teacher dress code to radio disc jockey).

[28] See, e.g., Garcetti, 547 U.S. at 425 ("Exposing governmental inefficiency . . . is a matter of considerable significance"); Borden v. Sch. Dist. of Twp. of E. Brunswick, 523 F.3d 153, 170

public concern. Plaintiff's Amended Complaint alleges that he broached his shift-length advocacy in terms of those concerns. This is not the case, like <u>Thomas</u>, where the plaintiff's grievances "relate[] to working conditions and other issues in union members' employment and <u>[plaintiff] offers nothing that would transform those personnel matters into issues of interest to the broader community</u>." 626 F App'x at 389 (emphasis added; quotation omitted).[29] Accordingly, the Court declines to dismiss based on qualified immunity on the theory that the right to advocate on matters concerning public safety or the municipal budget, as matters of public concern, was not clearly established.

---

(3d Cir. 2008)(speech is on a matter of public concern if it, e.g., regards speaker's thoughts of how "government[ was] wasting taxpayer's money")(citing <u>Czurlanis v. Albanese</u>, 721 F.2d 98, 104 (3d Cir. 1983)(plaintiff "spoke as a concerned citizen and taxpayer" about governmental practices "that he considered inefficient, wasteful, and possibly fraudulent")).

[29] The Court distinguishes <u>Killion II</u> and Killion, 696 F. App'x at 78-79, on these grounds. There, the District Court and the Third Circuit panel were each assessing a complaint that did not allege how or why shift length related to issues beyond the plaintiffs' own concerns about the conditions of their personal employment. That is plainly not the case here, and as such, the Court finds that those cases are not on point. <u>See</u> <u>Foster</u>, 2017 WL 2780745, at *11. Moreover, Defendants cannot say that they nevertheless reasonably relied on the <u>Killion</u> decisions in undertaking the allegedly retaliatory course of conduct against Plaintiff, because those opinions were not published until after Plaintiff was terminated in May 2015. <u>See</u> <u>Mpoy</u>, 758 F.3d at 295 ("<u>Winder</u> was decided approximately a year after the defendants fired Mpoy, and hence could not itself have been the basis for reasonable belief on the part of the defendants.").

Accordingly, to the extent that Plaintiff's Amended Complaint alleges that he was terminated in retaliation for speech that he undertook outside the scope of his ordinary job responsibilities as a Pennsauken police officer, on a matter of public concern, the individual Defendants' qualified immunity is certainly not apparent on the face of the Amended Complaint. This conclusion is supported by the decisions of other district courts in analogous cases.

In Keeton v. Bd. of Educ. of Sussex Tech. Sch. Dist., the magistrate judge declined to recommend dismissal of a First Amendment retaliation claim on qualified immunity grounds where the plaintiff "clearly alleges that he spoke out to his supervisor as a public citizen--that is, that his complaints did not fall within the ambit of his official employment duties. At least by the time of the Supreme Court's 2014 decision in Lane, the caselaw was clear that so long as a public employee's speech (of the kind at issue here) was not offered as part of his ordinary job duties, it qualifies as 'citizen speech'--even if (as here) the employee acquired information relating to the speech by virtue of his employment, and spoke up the 'chain of command'"; that the plaintiff's speech "would have clearly qualified as being of 'public concern'"; and that he was fired as a result. No. 15-1036-LPS, 2016 WL 5938699, at *12 (D. Del. Oct. 12, 2016)(citing Flora, 776 F.3d at 179, Dougherty, 772

F.3d at 990). The court framed the inquiry as whether, accepting the allegations of the complaint as true, "the Individual Defendants' conduct would be seen as violating" the "'clearly established' right" "to be free from retaliation for exercising one's First Amendment rights." Id.

In Brown v. Office of State Comptroller, the court, accepting the plaintiff's allegations as true, found that, even before Lane, "the law was clearly established that an employer could not retaliate against an employee who speaks as a citizen on a matter of public concern. Furthermore, it was clear that an employee who spoke outside of her official duties would be considered to be speaking as a citizen. No reasonable employer in [the defendant's] shoes would have believed that she would be permitted to take adverse action against Brown for statements made to the Auditors that were made outside Brown's official duties"; because the court was required to "take as true the allegations that Brown was not speaking pursuant to her official duties[,]" the court denied the motion to dismiss on qualified immunity grounds. 211 F. Supp. 3d 455, 474 (D. Conn. 2016).[30]

---

[30] See also O'Donnell v. Knott, 283 F. Supp. 3d 286, 204 (E.D.Pa. 2017)(qualified immunity defense rejected without prejudice where, when facts were "taken in the light most favorable to Plaintiff, it is plausible that a reasonable detective should have been aware that" threatening to arrest the plaintiff for fraudulent impersonation for maintaining social media account that it was plausible "no reasonable reader" would actually attribute to target of social media account, violated account-

holder's constitutional right, as such a social media account
was plausibly satirical and therefore protected under "clearly
established" precedent); <u>Cope v. Brosius</u>, No. 4:12-CV-2382, 2018
WL 2091359, at *18 (M.D.Pa. Mar. 14, 2018)(no qualified immunity
where defendant retaliated against plaintiff "for speaking out
about her own self-dealing and other improper conduct as mayor"
because "right was clearly established, as Third Circuit
precedent established that a citizen's interest in speaking out
about alleged governmental impropriety 'occupies the highest
rung of First Amendment protection'" and a "reasonable
government official in Brosius' position would know that
retaliating against someone for exercising his First Amendment
rights was a violation of the law" and finding that the record
did not necessarily "support[] a finding that Brosius would have
taken the same action even had Cope not spoken out against
her")(quoting <u>Dougherty</u>, 772 F.3d at 991 and <u>Swineford v. Snyder
Cty.</u>, 15 F.3d 1258, 1273 (3d Cir. 1994); citing <u>Larsen v. Senate
of the Commonwealth</u>, 154 F.3d 82, 94-95 (3d Cir. 1998)). <u>But see</u>
<u>Holt v. Pennsylvania</u>, No. 10-5510, 2014 WL 4055864, at *5
(E.D.Pa. Aug. 14, 2014)(holding, as alternative ground, that
even if "<u>Lane</u> constituted an intervening change in law,"
qualified immunity would be appropriate because of holding in
<u>Lane</u> that Franks was entitled to qualified immunity "since the
First Amendment protection of a public employee's sworn
testimony outside of the course of his ordinary job
responsibilities was not a right that was 'clearly established
[in the Eleventh Circuit]' at the time the testimony was made"
where conduct at issue in <u>Holt</u> similarly pre-dated <u>Lane</u>
decision; state of the law protected defendants in <u>Holt</u>);
<u>Meagher v. Andover Sch. Comm.</u>, 94 F. Supp. 3d 21, 41-44 (D.
Mass. 2015)(qualified immunity appropriate where plaintiff sent
email as part of union activities and was terminated because
"reasonably competent official in McGrath's position could have
believed that she was not violating the First Amendment by
terminating Meagher under the circumstances" where defendant
"obtained the advice of counsel" before deciding to terminate
plaintiff; and, "[m]ore importantly, at the time of the
termination in 2012, the Supreme Court had not had occasion to
clarify 'the scope of a public employee's employment duties and
what it means to speak pursuant to those duties' following its
decision in <u>Garcetti</u>" and it "was not until 2014, when the
Supreme Court decided <u>Lane</u>, that the Court explained that 'the
mere fact that a citizen's speech concerns information acquired
by virtue of his public employment does not transform that
speech into employee--rather than citizen--speech[,]' and that
the 'critical question' for purposes of the First Amendment

Such a holding would only be strengthened with the benefit of
_Lane_, _Dougherty_, and _Flora_--as Defendants had (or should have
had) at the time Plaintiff was terminated in mid-2015.

Finally, the Court disagrees that the Third Circuit's non-
precedential opinion in _Houston v. Randolph_ renders Defendants'
position reasonable. There, the court found that the plaintiff
was speaking as an employee because of his particular role: as
the plaintiff, the former captain and current "training officer"
of the Rapid Intervention Team ("RIT") of the Randolph Volunteer
Fire Department ("RVFD"), stated in a letter to the chief of the
RVFD (and individual defendant), the plaintiff's "role as 'the
person responsible for training' the [RIT] included the 'duty to
correct errors and deviations in [RIT] procedures.' Thus, [the
plaintiff's] complaints regarding [RVFD's] training and dispatch
protocols for its RIT were made 'pursuant to [his] official

---

analysis 'is whether the speech at issue is itself ordinarily
within the scope of an employee's duties, not whether it merely
concerns those duties[,]'" citing _Lane_, 134 S. Ct. at 2379;
qualified immunity also appropriate because "both before and
after _Lane_" "each case must turn on [its] specific factual
context" and "the contours of the [First Amendment] right were
still cloudy" and because outcome of _Pickering_ balancing test
"was not so clear as to put all reasonable officials on notice
that firing" Meagher "would violate" the First Amendment, under
First Circuit precedent). _Cf._ _Holt v. Pennsylvania_, 683 F. App'x
151, 159 (3d Cir. 2017)(qualified immunity granted where Third
Circuit "has not considered" and "sister circuits are split on
the issue" of "whether the initiation of an internal
investigation can constitute an 'adverse action' for purposes of
a First Amendment retaliation claim").

duties' and receive no First Amendment protection." 559 F. App'x at 142. It would not be reasonable to extend that holding, on that opinion alone, to a situation where the employee did not describe his own role as including the duty to correct errors and deviations in the procedures about which he now complained. The comparison is not persuasive.

The Court similarly finds that the right to freely associate with a union, certainly with regard to "speak[ing] on matters of public concern," see Rossiter v. City of Phila., 674 F. App'x 192, 197-98 (3d Cir. 2016)(citing Connick, 461 U.S. at 154 (1983))[31], was clearly established, and will decline to grant the motion to dismiss as to that claim on qualified immunity grounds. See also Labov, 809 F.2d at 222-23 ("Plainly efforts of public employees to associate together for the purpose of collective bargaining involve associational interests which the first amendment protects from hostile state action.").

Accordingly, the Court finds that the individual Defendants' qualified immunity is not apparent from the face of the Amended Complaint. Their motion to dismiss on those grounds will therefore be denied at this time.

---

[31] The Court notes again that the Third Circuit has not definitively held that the "public concern" requirement also applies to a free-association retaliation claim. See Sanguigni, 968 F.2d at 400.

## D. **Monell** Liability

Defendants argue that the § 1983 claims against the municipality in the Amended Complaint must be dismissed because Plaintiff does not plead that he was retaliated against, in violation of his First Amendment rights, "pursuant to a municipal policy or custom." [Docket Item 32 at 40, citing Fagan v. City of Vineland, 22 F.3d 1283 (3d Cir. 1994).] See Monell, 436 U.S. at 690-91. Defendants argue that Plaintiff "fails in the Amended Complaint to identify any Township policies, much less how the violation of those policies caused a civil rights violation." [Docket Item 32 at 41.]

In response, Plaintiff argues that he is relieved of the burden of alleging an "official written policy of retaliating against officers who exercise their First Amendment [r]ights" because "Plaintiff was retaliated against by a municipal policymaker, specifically, the Chief of Police." [Docket Item 36 at 27.] In support, Plaintiff states that "[f]ederal courts have consistently held that Chiefs of Police in New Jersey are official policymakers whose conduct binds the municipality they serve." Id. at 27-28 (citing Hernandez v. Borough of Palisades Park Pol. Dep't, 58 F. App'x 909, 913 (3d Cir. 2003).

In order for a municipality to be liable for a constitutional tort committed by its employees, it is not sufficient for a plaintiff to rely on the doctrine of respondeat

superior. See Natale v. Camden Cty. Corr. Fac., 318 F.3d 575,

583 (3d Cir. 2003)(citing Monell, 436 U.S. at 691). Instead, the

plaintiff must allege that there was a relevant municipal

"policy or custom, and that the policy caused the constitutional

violation they allege." Natale, 318 F.3d at 584 (citing Bd. of

Cty. Comm'rs of Bryan Cty. v. Brown, 520 U.S. 397, 404 (1997)).

"A government policy or custom can be established in two ways.

Policy is made when a 'decisionmaker possess[ing] final

authority to establish municipal policy with respect to the

action' issues an official proclamation, policy, or edict.

Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986). A

course of conduct is considered to be a 'custom' when, though

not authorized by law, 'such practices of state officials [are]

so permanent and well settled' as to virtually constitute law.

Monell, 436 U.S. at 690[.] . . . In either of these cases, it is

incumbent upon a plaintiff to show that a policymaker is

responsible either for the policy or, through acquiescence, for

the custom." Andrews v. City of Phila., 895 F.2d 1469, 1480 (3d

Cir. 1990), superseded by statute on other grounds. In general,

"a municipality may only be liable for the torts of its

employees in one of three ways: First, the municipality will be

liable if its employee acted pursuant to a formal government

policy or a standard operating procedure long accepted within

the government entity, Jett v. Dallas Indep. Sch. Dist., 491

U.S. 701, 737 (1989); second, liability will attach when the individual has policy making authority rendering his or her behavior an act of official government policy, Pembaur v. City of Cincinnati, 475 U.S. 469, 480-81 (1986); third, the municipality will be liable if an official with authority has ratified the unconstitutional actions of a subordinate, rendering such behavior official for liability purposes, City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988)." McGreevy, 413 F.3d at 367.

"[A]n official with policymaking authority can create official policy, even by rendering a single decision." Id. at 367-68 (citing Pembaur, 475 U.S. at 480). Whether a given individual was a "final policymaker [is] a question of state law." McGreevy, 413 F.3d at 368. "In order to ascertain if an official has final policy-making authority, and can thus bind the municipality by his conduct, a court must determine (1) whether, as a matter of state law, the official is responsible for making policy in the particular area of municipal business in question, McMillian v. Monroe Cty., 520 U.S. 781, 785 (1997) and []Praprotnik, [485 U.S at 123], and (2) whether the official's authority to make policy in that area is final and unreviewable. Praprotnik, 485 U.S. at 126; Pembaur, 475 U.S. at 483; McGreevy, 413 F.3d at 369[.]" Hill v. Kutztown, 455 F.3d at 245-46. "However, if a municipal employee's decision is subject

to review, even discretionary review, it is not final and that employee is therefore not a policymaker for purposes of imposing municipal liability under § 1983." Brennan v. Norton, 350 F.3d 399, 428 (3d Cir. 2003).

In Hernandez, the Third Circuit looked to "both New Jersey statutes and the Borough's own Police Manual" to "establish that the Chief of Police was the relevant policymaker." 58 F. App'x at 913 ("See N.J.S.A. § 40A:14-118 (where position of Chief of Police is established, this position 'shall be the head of the police force and . . . shall be directly responsible to the appropriate [municipal governing] authority for the efficiency and routine day-to-day operations thereof"); Police Manual 5:1.1-1.2, 6.1, 6.1.4 (noting that Chief of Police is highest ranking officer, that 'command shall be exercised by the virtue of rank' and that the Chief shall have 'complete authority over all police personnel functions and operations' and shall 'set[] the administrative policies of the department')." See also Estate of Bard v. City of Vineland, No. 1:17-cv-01452-NLH-AMD, 2017 WL 4697064, at *3 (D.N.J. Oct. 19, 2017)("Under New Jersey law, the chief of police is the relevant policymaker for a municipal police department")(citing Hernandez and N.J.S.A. 40A:14-118); Zampetis v. City of Atlantic City, No. 15-1231 (NLH), 2016 WL 5417195, at *2 n.1 (D.N.J. Sept. 28, 2016)(same); Payano v. City of Camden, No. 13-2528(NLH), 2016 WL 386040, at

\*6 (D.N.J. Feb. 1, 2016)(same); <u>Merman v. Camden</u>, 824 F. Supp.
2d 581, 596 n.30 (D.N.J. 2010)(". . . a reasonable fact finder
could conclude that the Chief of Police [was the relevant
municipal decision-maker] and knew or should have known [of the
alleged constitutional violations].")(citing <u>Hernandez</u>, 58 F.
App'x at 913)); <u>Cordial v. Atlantic City</u>, No. 1;11-cv-
01457(RMB/AMD), 2014 WL 2451137, at \*3 (D.N.J. June 2,
2014)(chief of police is policymaker under New Jersey law,
notwithstanding statutory language providing that chief of
police is "directly responsible to the appropriate
authority")(citations omitted); <u>Glass</u>, 2007 WL 1723472, at \*7
(chief of police was policymaker "for purposes of transfers in
the police department, as is evidence from the Director of
Public Safety's inability to curtail him").

The particular area of policymaking is relevant to this
analysis: in <u>Hill v. Kutztown</u>, the Third Circuit distinguished
between the ability to fire and the ability to constructively
discharge, and ruled that, although the defendant-mayor did not
have policymaking authority as to the former, he did have that
authority as to the latter, and accordingly, the plaintiff
stated a claim for municipal liability where he alleged he was
constructively discharged rather than fired. 455 F.3d at 246.[32]

---

[32] "Hill alleges that [Mayor] Marino constructively discharged
him. As Hill points out, as a matter of state law, <u>no</u> government

93

See also <u>Mrazek v. Stafford Twp.</u>, No. 13-1091(FLW), 2017 WL
1788655, at *11 (D.N.J. May 5, 2017)("New Jersey's 'Chief's Bill
of Rights' does not confer 'final and unreviewable' authority to
Chief Giberson to make policy or decisions <u>in the particular</u>
<u>context of promoting officers</u>" and distinguishing <u>Hernandez</u> as
finding chief of police final policymaker "for 'personnel
functions and operations' and in setting 'administrative
policies of the department'")(emphasis added); <u>Black v.</u>
<u>Stephens</u>, 662 F.2d 181, 189-91 (3d Cir. 1981)(Allentown,
Pennsylvania chief of police was final policymaker regarding
investigation of complaints, discipline of officers, and
encouragement of excessive force where chief testified that he
"was the 'disciplinary agent' for the police department" and
"wrote and implemented the disciplinary regulation at issue,"
and "is a member of the Mayor's cabinet, proposes and manages
the budget and establishes policies and procedures for the

---

employee or body <u>is permitted to</u> constructively discharge an
employee by making his working environment intolerable. As we
discussed, however, Hill has alleged that the Mayor <u>had the</u>
<u>power to</u> constructively discharge him, though he (Marino) lacked
the power as Mayor to fire him outright. Moreover, Marino's
constructive discharge of Hill was final in the sense that it
was not reviewable by any other person or any other body or
agency in the Borough. That is, there was no one 'above' the
Mayor who had the power to curtail his conduct or prevent him
from harassing Hill to the point where Hill had no alternative
but to leave his position. In this sense, Marino was a final
policy-maker for the purpose of constructively discharging
Hill." <u>Id.</u> at 246.

entire police department"); <u>Miller v. City of East Orange</u>, 509
F. Supp. 2d 452, 458 (D.N.J. 2007)(chief of police who allegedly
intentionally lied before the grand jury was not "making
'policy' for the City of East Orange" by doing so because
"implicit limitation" of "policymaking authority granted to the
East Orange Police Chief" is abiding "by state and federal law";
commission of a criminal act would be "acting outside the scope
of his policymaking authority for the City").

     Here, in response to Plaintiff's argument that Defendant
Coffey was a municipal policymaker pursuant to <u>Hernandez</u> and
<u>McGreevy</u> for <u>Monell</u> purposes, Defendants submit that <u>Hernandez</u>
is distinguishable because "the Third Circuit found there was no
proof of any municipal custom because the policymaker had no
notice of the alleged constitutional violations. Similarly, . .
. Defendants did not have notice that Foster's speech and
conduct . . . was a constitutionally protected activity."
[Docket Item 39 at 16.] The Court finds that this mistakes the
holding of <u>Hernandez</u>, where the claim pressed did not rely on
the municipal policymaker having affirmatively committed the
tort (in <u>Hernandez</u>, officers robbing citizens). Here, Plaintiff
certainly adequately alleges that Defendant Coffey (the Chief of
Police) had the requisite knowledge <u>of the activity constituting</u>
<u>the tort</u>, i.e., the alleged retaliation, as it alleges that he
<u>committed</u> it. <u>Hernandez</u> does not stand for (or even discuss) the

proposition that the municipal policymaker must appreciate the wrongfulness of the conduct alleged to be the tort; this argument seems, to the Court, to repackage Defendants' qualified immunity argument.

Accordingly, the Court finds that the Amended Complaint adequately alleges that the retaliatory conduct aimed at Plaintiff occurred pursuant to the decisions and actions of the relevant municipal policymaker, namely, Defendant Coffey as the Chief of Police, and thereby adequately states a claim against the Township of Pennsauken pursuant to <u>Monell</u>. Accordingly, Defendants' Motion to Dismiss the claims against the Township will be denied at this time.


**V.   CONCLUSION**

For the foregoing reasons, the Court will deny Defendants' Motion to Dismiss. This Opinion does not address whether Plaintiff shall be collaterally estopped from asserting any or all of his claims due to a recent, unfavorable decision of the Appellate Division of the Superior Court of New Jersey, and a process for addressing such issues is addressed in a separate Letter filed today.

An appropriate Order shall issue, and the Clerk shall reopen this case upon the docket. Defendants shall file their

Answer on or before fourteen (14) days from the date of entry of this Opinion upon the docket.

**August 7, 2018**
Date

                              **s/ Jerome B. Simandle**
                              JEROME B. SIMANDLE
                              U.S. District Judge